620 So.2d 319 (1993)
WEST JEFFERSON LEVEE DISTRICT
v.
COAST QUALITY CONSTRUCTION CORP.
WEST JEFFERSON LEVEE DISTRICT
v.
BAYOU DES FAMILLES DEVELOPMENT CORP.
WEST JEFFERSON LEVEE DISTRICT
v.
Betty Jane Perrin, Wife of/and Ronald J. ISAAC.
Nos. 92-CA-506 to 92-CA-508.
Court of Appeal of Louisiana, Fifth Circuit.
May 25, 1993.
*322 Owen J. Bordelon, Gretna, Harry C. Stumpf, Gretna, for appellant/plaintiff West Jefferson Levee Dist.
Lawrence E. Chehardy, David C. Loeb, Chehardy, Sherman, Ellis & Breslin, Metairie, for appellees/defendants Coast Quality Construction Corp., Bayou Des Familles Development Corp. and Betty Jane Perrin, wife of/and Ronald J. Isaac.
Harry Rosenberg, U.S. Atty., Nancy Nungesser, Asst. U.S. Atty., E.D.La., New Orleans, Vicki A. O'Meara, Acting Asst. Atty. Gen., Anne S. Almy, Edward A. Boling, Attys., U.S. Dept. of Justice, Washington, DC, for U.S.
Before GRISBAUM, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiff, West Jefferson Levee District (Levee District), appeals from three judgments in consolidated expropriation suits filed under the quick taking statutes, La. R.S. 38:351 et seq. The property involved both federal jurisdictional wetlands and non-wetlands and was expropriated for the construction of the Jefferson Parish westbank hurricane protection levee. The expropriation proceedings were instituted after a lengthy delay, over twenty years from the recognition of the need for the levee by the public and the local, state and federal authorities (1965) and over ten years from the barring by the United States Corps of Engineers (Corps) of the defendants from developing the property by denying an after-the-fact permit to build in wetlands areas (1979). We affirm in part, amend in part and affirm as amended.
The Levee District filed suit against Bayou Des Families Development Corporation (BDF) on February 15, 1989, against Ronald and Betty Isaac on June 30, 1989, and against Coast Quality Construction Corporation (Coast) on July 12, 1989. Pursuant to statute, it deposited money into the court registry that it had concluded was sufficient to compensate the landowners for the taking, but not for severance damages. The Levee District deposited $213,206 for BDF, $24,726 for the Isaacs and $13,058 for Coast. The deposits were based on property values per acre ranging from $500 to $550 for wetlands and $23,000 to $25,000 for non-wetlands. The non-wetlands were a minimal portion of the deposits.
The landowners filed answers and reconventional demands for additional amounts of compensation in late 1989. The petitions, amended at various times prior to trial, asserted alternate taking dates in 1979 and 1989. They also demanded severance damages and damages for the delay in expropriating the property.
The Levee District responded, in May 1991, with exceptions of no cause of action and prescription directed at the reconventional demands. The exceptions were denied by the trial judge on June 10, 1991.
A judge trial was held on six days in September, 1991[1] to determine the appropriate compensation. After the trial, the judge rendered judgments in favor of the three landowners. He awarded BDF $2,849,000 for the value of the land taken and $14,478,000 for severance damages. He awarded the Isaacs $975,000 for the value of the land taken and $1,194,000 for severance damages. Coast was awarded $1,480,000 for the value of the land taken and $703,000 for severance damages. In *323 addition, delay damages were awarded at the rate of 10% per year, calculated on the value of the various properties from September 21, 1979, the date the Corps denied the landowners a permit to develop the properties. The delay damages to BDF totalled $15,642,664, to the Isaacs, $1,654,145, and to Coast, $1,685,935. In addition, the trial judge awarded costs and attorneys fees. Pursuant to La.R.S. 38:387(E), he awarded attorneys fees in the amount of 25% of the difference between the amount deposited in the registry of the court and the amounts awarded. Those amounts were $8,189,114 to BDF, $949,605 to the Isaacs, and $963,969 to Coast. Under the authority of R.S. 48:455, the trial judge also awarded interest. This was calculated on the difference between the sums deposited into the registry of the court and the amounts awarded in the expropriation suits, from the date that title vested in the Levee District, which is the date the Levee District deposited the funds into the registry of the court.

FACTS
The facts are basically undisputed. In 1965 it became apparent that a levee was needed on the westbank of Jefferson Parish to protect large populated areas from hurricane flooding. The parish, various state and federal agencies, interested individuals and special interest groups began discussions to determine the location of a locally planned and financed hurricane protection levee. Studies were instituted. Although the Corps had no permitting powers over wetlands in June of 1972, it nevertheless recommended a levee alignment based on those studies.
At a formulation meeting in Gretna, Louisiana, one month later, the plan was contested by various conservation and environmental groups, the National Park Service and the U.S. Department of Interior, because of concerns ranging from the effect on wildlife, the environment and the pending feasibility study for a proposed federal water park to be located in the area. The water or wetlands park was to be part of a federal Louisiana park system called the Jean Lafitte National Park.
At this time, the economy was booming and the population of the westbank was growing. Everyone involved recognized that the levee alignment would determine the growth boundaries of the westbank because no development could occur on the unprotected side of the levee since it would be subject to flooding. It also became apparent that the levee would serve as a boundary for the proposed park.
BDF purchased the properties at issue here in August, 1972 in order to construct low-to-moderate income housing communities. Immediately after purchasing the land, BDF sold three parcels of approximately 101 acres each to the Isaacs, to Coast and to a third purchaser who is not a party here.
BDF was formed by several individuals with a wide range of experience and success in these types of construction projects. The company was set-up as a "land bank", from which each investor could draw certain acres at one time in order to build their individual residential developments. BDF purchased the land based on information that there was a need for low-to-moderate income housing in the area and that there were no legal obstacles to overcome in order to develop those communities in this area of the parish. When it purchased the property, BDF was aware of the levee studies and the possibility of a water park. However, in June, 1972 the Corps had preliminarily suggested a levee alignment which would protect and enclose the BDF, Coast and Isaac properties. There were no state or federal regulations requiring permits to develop wetlands at that time and the Parish was in favor of the BDF project.
After purchasing the land, BDF began to implement construction of the basic improvements. It hired an engineering firm to design a hurricane protection levee along the June 7th, 1972 alignment recommended by the Corps, a sewerage treatment plant and a portable water line. VTN Corporation was hired to develop the Master Plan for the entire development. The plan was completed in February, 1973. Construction of the improvements, intended *324 to service the Coast and Isaac parcels as well, commenced. Except for the levee, those improvements were all donated to the parish.
In the meantime, from 1972 onward, Congress began passing a series of amendments to the Federal Water Pollution Control Act and the Rivers and Harbors Appropriation Act which gave the Corps regulatory power over the discharge of pollutants into navigable waters. The regulations required a permit to dredge or fill navigable waters and that term eventually included wetlands.[2] The required permit from the Corps to fill and/or dredge a wetland area became known as a "§ 404 permit", after the pertinent section of the Clean Water Act, and which is now found in 33 U.S.C. § 1344.
In addition to the § 404 permit, under § 10 of the River and Harbors Appropriation Act of 1899, a permit for works on or affecting navigable waterways of the United States was required.[3] In 1977, those § 10 permits were placed under the regulatory power of the Corps. The State of Louisiana subsequently assumed the management of these activities, pursuant to 33 U.S.C. § 1344(g)(1), through the Coastal Management Division of the Louisiana Department of Natural Resources (Coastal Management). Decisions of both the Corps and Coastal Management are subject to veto by the federal Environmental Protection Agency (EPA). See: 33 U.S.C. § 1344. (The Clean Water Act, § 404(c)).
The requirement of a § 404 permit was not officially enforced until October 1973, one year after its passage and after the purchase by the landowner of its properties. Various changes and revisions were made between 1973 and 1979. The permits began to be issued in April 1974, following the publication of the first set of guidelines by the EPA.
From 1972 through 1974, BDF was in the process of completing its improvements, including a levee which was being built on the alignment recommended by the Corps in 1972. The construction came to a halt, however, in January, 1974 when the Corps issued a cease and desist order. Another order was issued in March, 1974, but BDF was allowed to apply for an after-the-fact permit. At that time, the levee was 90% complete and litigation ensued. By December, 1975 the permit application process had resumed, and the application was complete and was ready to be acted on by the Corps.
The application was not acted on until 1979, when the Corps denied the application for a permit because the BDF property was in the area being considered for the location of the westbank levee and its location was still uncertain.
During and after the landowners' construction activity on the property, the location of the levee was being debated in meetings and public hearings. The landowners and parish argued in favor of the location used by the landowners. They argued that it allowed development of the westbank along a natural and historical pattern. The landowners were also willing to donate the property needed for the levee, thus saving the parish acquisition costs.
The Department of Interior and the park proponents argued that the BDF alignment destroyed hundreds of acres of wetlands. They urged an alignment which protected as many acres of wetlands as possible. They also urged a delay to allow Congress time to decide on the park.
In 1973, the Department of Interior had submitted a park proposal to the Jefferson Parish council, which included a protection or buffer zone. Finally in 1978, Congress officially created the Jean Lafitte National Park. (See: 16 U.S.C. § 230).
*325 From 1978 on, the factors affecting the location of the levee continued to be considered. The strong opposition to BDF's alignment and heavy pressure for the less restrictive alignment created considerable debate and delay. The parish was concerned about excessive costs in expropriating what had been developable property. It had been informed that the BDF alignment would be donated by the landowners, thus, saving millions of dollars in land compensation costs. The opposition was unmoved and solely concerned with preserving the integrity of the wetlands for possible inclusion in the park. In 1980, the parish applied for a permit along the BDF alignment hoping to speed up the levee project.[4]
Eventually several alignment choices were submitted by various parties. Seven were accepted for consideration (A through G). Alternative D was the choice of the parish and landowners and followed the original BDF levee for the most part, whereas E was the preferred alignment of the opposition.
In 1984, the Corps selected an alignment which was a modified version of E. Modified E precluded any further development of the property because it left the property unprotected from hurricane flooding and the normal ebb and flow of the tides. The Corps, in its letter to the parish, stated that one of the reasons that the modified alignment E was chosen was because it had the least impact on the wetlands and because the parish had not shown sufficient need to justify wetland destruction.
The parish continued to try to get the Corps to change the decision. As of this date, all of the parties, the Corps, the parish and the Levee District understood the right of way costs for alignment would be prohibitively expensive. Progress then came to a halt.
The attempts to change the decision continued into 1985. But in that fall, a nearmiss by one hurricane and flooding on the westbank by Hurricane Juan created pressure on the council to begin constructing the levee. As a result, the parish council reluctantly elected to accept modified alignment E and it was subsequently issued a permit to built on that alignment. However, it continued to press for alignment D. But, in the meantime, the Jefferson Parish council passed a resolution on September 11, 1985 transferring responsibilities to the Levee District for construction of the Westbank hurricane protection levee. In February, 1986, the parish transferred the permit to the Levee District, who accepted the responsibility to build the levee along modified alignment E.
Because of the expense in building along modified alignment E, the Corps began studying the levee for purposes of authorizing federal funding. Federal funding was approved for development of a levee under the Water Resources Development Act of 1986. See: 33 U.S.C. § 2201 et seq. Following completion of the Corps' final environmental impact study in December, 1986, on April 20, 1987 the Corps approved the Project for funding. But, it was not until 1990 that an agreement was drawn up and executed between the Levee District and the Corps to share in the cost of a levee system which goes beyond the cut-off point of modified alignment E and completely protects the residential areas bordering on the wetlands. This agreement is referred to as a Local Cooperating Agreement (LCA) and plays a part in the landowners' argument.
In late 1987, the Levee District authorized its appraisers to value the properties involved, and in mid 1988 the Levee District made demand on the landowners for the right of ways. When the landowners rejected the offer by the Levee District, the expropriation suits were filed.
In this appeal, the Levee District asserts exceptions of no cause of action, prescription and non-joinder of an indispensable party. Alternatively, it contends that the awards are excessive in that (a) the Corps is solely liable for the losses, and/or (b) the *326 value of the property before and after the taking was the wetland value of $500 per acre and not the value of developable property, as the trial judge determined.

EXCEPTIONS
The Levee District asserts that the pleadings of the landowners relate the damages to the property to the 1979 denial of the § 404 permit by the Corps. It argues that the taking which deprived the landowners of the property, and any damages related to the taking, were caused by the Corps, not the Levee District. Therefore, the Levee District is not liable. Thus, the landowners have not pled a viable cause of action against the Levee District.
The Levee District also asserts that, assuming arguendo that the landowners stated a cause of action against them, the Corps must be joined as an indispensable party, since it is the Corps' actions which removed the property from commerce in 1979.
In regard to the exception of prescription, the Levee District asserts that if there is a cause of action against it for the taking in 1979, the action is one for inverse condemnation or appropriation, which is a taking without the prior exercise of eminent domain and payment of compensation to the landowner. See: Hawthorne v. Louisiana Department of Public Works, 540 So.2d 1261 (La.App. 3rd Cir.1989), writ denied, 544 So.2d 406 (La.1989). Under La. R.S. 13:5111, claims for these types of takings prescribe three years from the date of such taking. Thus, the Levee District contends that the claims are prescribed.
The United States filed an Amicus Curiae brief in this appeal. Without conceding a taking occurred by the United States, it asserts that the claims and the judgment relate the right to compensation to the actions of the Corps in either 1979 in denying the § 404 permit, or, in 1984 in rejecting alignment D. It agrees with the Levee District that the exception of no cause of action should be maintained, because actions for uncompensated takings by the Corps, if that occurred here, are subject to the exclusive jurisdiction of the United States Court of Claims. See: The Tucker Act, 28 USC § 1491; BDF Corp. v. U.S. Corps of Engineers, 541 F.Supp. 1025 (E.D.La.1982).
The United States argues that the exclusive jurisdiction conferred on the United States Court of Claims is an exception to the sovereign immunity of the United States and cannot be waived, even by contract. To do so would impinge on the authority of Congress to create exceptions to sovereign immunity. See: United States v. Nordic Village, ___ U.S. ___, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Thus, insofar as the trial judge and landowners relied on the LCA executed between the Corps and the Levee District to determine that the Levee District is primarily responsible for compensation related to Corps acts, that reliance is legally misplaced and erroneous. Further, the United States asserts that interpretation of the LCA is outside of the scope of judicial review in a state expropriation proceedings since the landowners are not a party to the agreement. See: Sanborn v. Oceanic Contractors, Inc., 430 So.2d 232 (La.App. 4th Cir.1983). And, even if the contract was properly considered, the language does not support the trial judge's holding. The provision which holds the United States harmless from its acts only pertains to "damages arising from the construction, operation, and maintenance of the Project ..." (LCA Art. IX). Here, the United States contends that the "damages" arise from Corps regulatory decisions which are separate from the operation costs of the levee.
The United States also distinguishes the jurisprudence relied on by the trial judge to hold that, in a combined federal and local activity, the local assuring agency is primarily responsible for the taking, subject to a credit or reimbursement from the federal agency. The United States asserts that neither case involves inverse condemnation allegations, as here. In one, Singleton Sheet Metal Works, Inc. v. City of Pueblo, 727 F.Supp. 579 (D.Colo.1989), the city of Pueblo took the property. Pursuant to a LCA, the city was responsible for compensation for relocation expenses under *327 the Federal Relocations Assistance Act. The plaintiff had sued for additional relocation expenses and not for compensation due from a "taking".
In Succession of Rovira v. Board of Comm'rs, 418 So.2d 1382 (La.App. 4th Cir. 1982), the city and the Dock Board (as the agency responsible for furnishing easements), conveyed to the United States a perpetual servitude over a portion of plaintiff's property. No expropriation proceedings were instituted nor was just compensation paid. The plaintiffs sued the Dock Board for "historical" taking, but there were no allegations of inverse condemnation by the United States. Thus, the United States asserts that neither case supports a position that the local agency, the Levee District, is responsible for alleged "takings" by the Corps.
The landowners respond to the exception of no cause of action by arguing first that the petitions allege alternate taking dates, one of which was 1979, another of which was 1989, and the court cannot grant a partial exception of no cause of action. Further they point out that they filed a federal suit to toll prescription, but that the federal suit involves inverse condemnation, unlike the actual taking here by the Levee District.
The landowners further contend that there is a cause of action against the Levee District because the taking in 1989 is the critical event that destroyed the value of the property, not the denial of the permit in 1979. All of the witnesses testified that the location of the levee would determine whether or not the property would be developable. Until that decision was made and acted on, the value was in limbo. They contend further that the factual finding by the trial judge, that the process which began in 1965 concluded in 1989 with the devaluation of the property because of the expropriation suits, was not manifestly erroneous, because it was not until then that the property was forever placed outside the levee system, causing it to become undevelopable wetlands.
The landowners point out that the mere denial of a permit is not a taking under federal law. In order to be considered a taking, the federal action must deprive the landowners of the "economically viable" use of the property, a specific fact issue. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126-27, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). Further, they assert that the jurisprudence shows that the federal entity is liable only when the action taken by the state or local agency is not related to the losses. They cite the following cases, which were also cited by the United States to support the federal court's exclusive jurisdiction: Formanek v. United States, 26 Cl.Ct. 332 (1992); Dufau v. United States, 22 Cl.Ct. 156 (1990); Loveladies Harbor, Inc. v. United States, 21 Cl.Ct. 153 (1990); Florida Rock Industries, Inc. v. United States, 21 Cl.Ct. 161 (1990). In all of these cases, the actions complained of were those of the Corps, not the state or local agency.
The landowners point out that the Levee District could have chosen not to accept the permit for modified alignment E and could have continued the stalemate until the Corps relented, noting that the federal government cannot build a structure in a state without local cooperation. The Levee District, however, chose to begin the work along modified alignment E despite the fact that both the Corps and Levee District knew that the right of way acquisition costs would be exorbitant. Further, as evidenced by the testimony and exhibits, they expected the Levee District to bear the costs. The landowners assert that the local sponsor is always liable for costs in implementing federal non-compulsory regulatory programs, citing: James E. Brookshire, Taking on the Leading Edge, United States Claims Ct. Bar Association Newsletter, Vol. 1, No. 5 at 9, September 1992; De-Tom Enterprises v. United States, 213 Ct. Cl. 362, 552 F.2d 337 (1977); Ursin v. N.O. Aviation Board, 506 So.2d 947 (La.App. 5th Cir.1987), reversed on other grounds; Adolph v. FEMA, 854 F.2d 732 (5th Cir. 1988).
The landowners argue that the Corps misinterpreted the reason that the LCA was referred to by the landowners and the *328 trial judge. They assert that it was not used to show a federal intent to indemnify the Levee District for federal inverse condemnation claims, but to reimburse the Levee District for the extra liability incurred when the Levee District accepted the Corps-proposed modified E alignment. The agreement made the acceptance feasible financially because of the known expensive acquisition costs of these right of ways.
In regard to the jurisprudence, cited by the trial judge and criticized by the United States, that the local sponsor is primarily liable, subject to a credit or reimbursement by the federal agency, the landowners assert that first, this is not an inverse condemnation suit and is not distinguishable on the basis that the cases do not involve inverse condemnation. Next, the landowners claim that the Singleton case was cited to show the existence of a LCA does not convert an otherwise local project into a federal project. As such, the Levee District, as the taking authority, remains liable to the landowners despite the agreement with the Corps. Finally, the landowners assert that the reason that the United States is involving itself in this case is that it intends to assert the six year statute of limitations in federal court to defeat the landowners claims on prescription and if the landowners succeed in federal court, the payment of the judgment will come from the federal judgment fund and will not be a charge against the funds appropriated by Congress for this project. As a result, this allows the federal agencies involved to avoid confessing that they misrepresented project costs when seeking Congressional approval for federal funding of the project.
The purpose of the peremptory exception of no cause of action is to determine the sufficiency in law of the plaintiff's petition. Darville v. Texaco, Inc., 447 So.2d 473, 474 (La.1984), Franks v. Duvall, 576 So.2d 1194, 1195 (La.App. 5th Cir.1991). It calls into question whether any remedy is afforded by law for the particular grievance set forth by the plaintiff. Robinson v. North American Royalties, Inc., 470 So.2d 112, 114 (La. 1985); Franks v. Duvall, 576 So.2d at 1195. The exception may be sustained only when it is clearly shown that the law affords no remedy to anyone for the particular grievance alleged. Franks v. Duvall, 576 So.2d at 1195.
If the allegations of the petition set forth a cause of action as to any part of the demand, the exception must be overruled. Franks v. Duvall, 576 So.2d at 1195, Cupp v. Federated Rural Elec. Ins. Co., 459 So.2d 1337, 1339 (La.App. 3rd Cir. 1984). The purpose of this rule is to avoid multiple appeals. Rodriguez v. American Bankers Insurance Company of Florida, 386 So.2d 652, 653 (La.1980), Franks v. Duvall, 576 So.2d at 1195. Thus, the court cannot grant a partial exception of no cause of action. Rodriguez v. American Bankers Insurance Company of Florida, 386 So.2d at 652, 653; Franks v. Duvall, 576 So.2d at 1195.
The exception of no cause of action is triable solely on the face of the papers. Darville v. Texaco, Inc., 447 So.2d at 474, 475. For purposes of determining the issues raised by the exception, the wellpleaded facts in the petition must be accepted as true. La.C.C.P. art. 927; Darville v. Texaco, Inc., 447 So.2d at 475.
In this case, the landowners asserted several distinct taking dates in their pleadings for additional compensation. They included the date the expropriation suits were filed and the funds deposited. Under the statute the latter constitutes a taking. La.R.S. 38:387(A). However, a taking without the formalities can also occur, which is commonly referred to as appropriation or inverse condemnation.
Assuming the facts to be true, the taking occurred on one of those alternative dates. Which date is the date of the taking was a matter for the trial on the merits. But, on the face of the pleadings, the 1989 expropriation, at the very least, constituted a taking by the Levee District, and, under the expropriation statutes, a cause of action exists for the landowners to pursue additional compensation against the Levee *329 District. See: La.R.S. 38:351 et seq. Since a cause of action is set forth as to at least one part of the demand, we conclude that the trial court did not err in denying the Levee District's exception of no cause of action.
In the next argument, the Levee District and the United States in its amicus curiae brief (reserving its right to contest that a taking occurred), assert that the exception should have been granted because if the date of the taking was 1979, as urged by the Levee District, then it is a taking by the United States, not the Levee District. As such, the petitions for additional compensation must be brought in federal claims court. We disagree.[5]
The expropriation and appropriation rights of the Levee District are limited by the property rights of individuals, under the Louisiana Constitution, Art. 1, § 4. See also: La.CONST. art. 6, § 42. Further, the Louisiana expropriation statutes require that the expropriating authority compensate the landowner "to the full extent of his loss". La.R.S. 38:387(C). The measure of compensation for the property taken is determined as of the time the estimated compensation was deposited into the court registry, and for severance damages, on the basis of immediately before and immediately after the expropriation. La.R.S. 38:387(A), (B).
The full extent of loss does not include "uses which are remote, speculative or contrary to law; uses for which the property is still suitable; or elements of property ownership which are not actually taken, used, damaged, or destroyed" for levee purposes. La.R.S. 38:281(4). However, delay damages are included as compensable damages for property taken out of commerce for an unreasonable length of time pending expropriation or completion of a project. See: State, Department of Transportation v. Maynard, 565 So.2d 532, 536 (La.App. 4th Cir.1990), writ denied, 568 So.2d 1079 (La.1990); State, Department of Transportation v. Brookhollow of Alexandria, Inc., 578 So.2d 558, 562 (La. App. 3rd Cir.1991), writ denied, 581 So.2d 709 (La.1991). See also: State, Through DOTD v. Chambers Investment Co., 595 So.2d 598, 606 (La.1992).
While we are not cited, nor have we found, cases directly on point with our facts, the trial judge concluded that the statute language supports a conclusion that the Levee District can be held liable for all the damages, regardless of when they were initiated, as in delay damages cases, or by whom, if the Levee District ultimately exercises its expropriation rights. The cases cited by the trial judge (Succession of Rovira; Singleton Sheet Metal Works, Inc.) while not dispositive, give support to this conclusion. See also: Vuljan v. Board of Commissioners of the Port of New Orleans, 170 So.2d 910 (La. App. 4th Cir.1965), writ refused, 172 So.2d 701 (La.1965), and Petrovich v. State of Louisiana, 181 So.2d 811 (La.App. 4th Cir. 1966).
We are aware that the federal court of claims has exclusive jurisdiction in cases involving losses caused by federal takings. We are persuaded, however, that the "critical events" herein were the three expropriations in 1989. Until then, the landowners had hopes, and the real possibility existed, that some argument would prevail on the Corps, or something would happen, to change the decision of the Corps rejecting alignment D. We find, therefore, that the landowners have stated a cause of action against the Levee District and said cause is not preempted by the exclusive jurisdiction of the United States Court of Claims.
The prescription issue was also properly rejected by the trial judge. On the basis of the above findings, the takings herein occurred when the expropriations were properly instituted and the ex parte order signed by the trial judge. See: La. R.S. 38:352; 38:353; 38:354. That occurred in 1989. Since the takings were the result *330 of the expropriations and not appropriations in 1979, the three year prescription under La.R.S. 13:5111 does not apply. Since there is no dispute that the landowners did not perfect their claims timely under the expropriation time delays (See: R.S. 38:300), we find that the trial court did not err in denying the Levee District's exception of prescription.
The final procedural obstacle raised by the Levee District is that the United States is an indispensable party, who must be joined in the event that the landowners prevail on the exception of no cause of action and prescription. In this respect, the landowners factually assert that their losses resulted from the actions of the Corps, and that the presence of the Corps is required for the granting of complete relief. See: La.C.C.P. art. 1064.
Indispensable parties are those whose interest in the subject matter are so interrelated, and would be so directly affected by the judgment, that a complete and equitable adjudication of the controversy cannot be made unless they are joined in the action. La.C.C.P. art. 641. The order for joinder, however, cannot issue unless the court can obtain jurisdiction over the unnamed party. See: La.C.C.P. art. 644 and 1064.
As we have previously concluded, the taker in this case is the Levee District. Based on our analysis of the jurisprudence and the facts, the Corps does not have the primary responsibility to the landowners, because the ultimate value destroying event was the 1989 expropriation by the Levee District. Additionally, the trial court does not have jurisdiction over the Corps. Thus, the Corps is not an indispensable party, regardless of its part in the events leading to the expropriation actions. We therefore conclude that the trial court did not err in denying the Levee District exception of non-joinder of an indispensable party.

VALUATION OF THE PROPERTIES
The next issue is whether the trial judge erred in his valuation of the property taken, the severance damages and the delay damages.
Just compensation is based on the market value of the property taken, which is the best and highest use of the property as of the date of the taking. La. R.S. 38:387(A); West Jefferson Levee District v. Mayronne, 595 So.2d 672, 679 (La. App. 5th Cir.1992). The date of the taking is the date that the deposit was made into the registry of the court. R.S. 38:387(A); West Jefferson Levee District v. Mayronne, 595 So.2d at 679.
Severance damages are due when the taking has adversely affected the value of the remaining property. R.S. 38:387(B); West Jefferson Levee District v. Mayronne, 595 So.2d at 679. Those damages are measured by the difference between the value of the land immediately prior to and immediately after the taking, after considering the effects of the completion of the project in the proposed or planned manner. R.S. 38:387(B); West Jefferson Levee District v. Mayronne, 595 So.2d at 679.
The highest and best use criteria is "that to which it is best adaptable in the not-too-distant future and which is not speculative or remote." West Jefferson Levee District v. Mayronne, 595 So.2d at 681. Various factors may be considered in this determination, as we set out in Mayronne:
"(a) Costs to clear and prepare the land for the particular purposes;
(b) Proximity of the land taken to areas already developed in a manner compatible with the use proposed;
(c) Some action already taken to develop the land for the use in question;
(d) A scarcity of land available for the use;
(e) Use permitted by the zoning ordinance of the parish or city in which the land taken is located;
(f) Use to which the land is put at the time of the taking; and
(g) Existence of offers to buy the property by those interested in developing it for the intended use.

*331 In addition, other factors are the evidence of a market demand in the vicinity for such use and specific plans of businesses and individuals in the area, including action already taken to develop the land for that use." Mayronne, 595 So.2d at 681. (citations omitted).
The Levee District argues that the landowners' experts based their opinions on the assumption that the landowners could have obtained a permit for alignment D. The Levee District contends that this evidence of value is highly speculative. Even if there was no expropriation, the permitability of the property was unlikely given the wetlands status, the creation of the park on the borders of the properties and growing environmental concerns.
The Levee District argues the value should be determined as of 1979, because, as stated previously, that is the date the property was effectively taken out of commerce. Because of that, the Levee District experts, Irvington Eppling and Peter Talluto, testified that the land value fell to between $500 to $550 per acre, a nominal value due to its status as undevelopable wetlands. They state that the highest and best use for wetlands is recreational hunting and fishing, etc.
The same argument is made for the severance damages. The Levee District argues that the remaining property suffered no loss because the entire tract was undevelopable wetlands immediately before and after the expropriations in 1989.
The Levee District also asserts that it is not liable for delay damages. It contends that the delays were due to the action or inaction of the Corps. However, it disputes that it is liable under the LCA for the federal conduct. It argues that the LCA refers to a separate project, not related to this levee. That separate project is the completion of a levee system around the residential areas of the westbank, beginning where modified alignment E ends.
Further, the Levee District claims that even if the LCA applies here, these claims do not fall within the contract language. The language creates liability on the local sponsor, here the Levee District, for claims arising from the operation, maintenance or construction of the levee project, which it argues, is not the case here.
The landowners respond by asserting that there is no manifest error or abuse of discretion in the valuation. See: West Jefferson Levee District v. Mayronne, 595 So.2d at 679. They cite the testimony, documentary evidence, the LCA and the Mayronne case to show the Levee District knew it was going to be liable for compensation in an amount based on the valuation of the property as commercially developable property.
The landowners also assert that it was the expropriation along modified alignment E which devalued the property. They argue that it decided the future parish growth line, set the park boundary, caused the property to be subject to hurricane flooding and tidal flow and foreclosed any possibility of the landowners ever obtaining the federal or local permits necessary to build outside the levee protection.
The landowners point out that, if the land is developable, then the damage awards must be upheld because the Levee District did not produce evidence disputing the values and damages testified to by the landowners' experts which was based on the developability of the land. The only values produced by the Levee District were for undevelopable wetlands.
In reference to the delay damages, the landowners cite three cases to support their argument that the Levee District is liable under the LCA. See: Clayton v. State Dept. of Transp. and Dev., 599 So.2d 394 (La.App. 5th Cir.1992); State, Dept. of Transp. and Dev. v. Brookhollow of Alexandria, supra and State, Dept. of Transp. and Dev. v. Maynard, supra, (overruled on interest only by State v. Estate of Davis, 572 So.2d 39 (La.1990).). They contend that these cases are applicable because they arose out of the inability of the state and federal government to execute the respective project in a timely manner.
The evidence shows that the mere fact that property is or contains wetlands does not preclude its development, assuming *332 that a § 404 or § 10 permit could be obtained. All of the witnesses privy to the permit process agreed to this fact.
Dr. Sherwood Gagliano and Dr. Joseph Krebs testified that the property is inherently developable.[6] They stated that although wetlands, the soil and elevations on the major portion of these parcels is composed of the same materials as many developed areas of both the east and westbank of the parish. The experts agreed that wetland status does not preclude development with proper engineering. Krebs and the appraisers, William Hartwell and Richard Brewster, further pointed out that the BDF group had a record of success for developments of this kind.
The testimony of the landowners and levee district witnesses recognized that the property is in the historical growth corridor of the West Bank. Dr. Gagliano also noted that the wetland areas in the growth corridor have a history of agricultural activities going back one hundred years. Robert Evans, the Parish Council chairman, testified that the parish expected the landowners property to be developed and saw no legal impediment to its development until the obstacle raised by this levee project. He stated that it was for this reason that the parish expected the acquisition costs of the right of ways for the levee to be high.
The Levee District appraisers, Talluto and Eppling, stated that the value of wetlands, which are not developable because no permit can be obtained, is $500 to $550 per acre. There were some areas of nonwetland or protected acreage, which they valued at $23,000 to $25,000 per acre (BDF had six separate parcels of varying sizes. Approximately six acres were non-wetlands). The witnesses did not assess a value for severance damages because they asserted that the land was worth the wetlands value before and after the taking.
The landowners' experts on value and delay damages were Hartwell, Brewster and Dr. Wade Ragas. Their values were based on the opinions of Gagliano and Krebs. Those witnesses testified that the property would have been developed according to the Master Plan if the levee project had not interfered.
The trial judge, in his discretion, utilized the values of Hartwell in calculating the compensation for the land taken and severance damages. He preferred Hartwell's figures because he did not agree with Brewster's method of valuing all contiguous property under one ownership as one parcel. Brewster's method resulted in lower values per acre for BDF. The trial judge was of the opinion that the lower values did not accurately reflect the market value because the BDF land was actually divided into parcels, because BDF had a history of selling parcels and because BDF is entitled to full compensation under the law.
Hartwell testified in detail concerning value per acre, per parcel, before and at the time of the taking, giving lesser value to existing servitudes. His average value was approximately $23,000 per acre. Brewster's calculations resulted in a total difference of $1,739,419 less for BDF, $395,214 less for Coast and $394,722 less for Isaac. Both experts factored in the location of the property in the historical growth corridor of the westbank, comparable sales and development and the slowdown of growth in the 1980s. Both experts stated that the other expert testimony was based on valid appraisal methods. They agreed that delay damages of 10% simple interest per year on the value would be an appropriate award and that unprotected wetlands are worth $500 per acre.
Hartwell and Brewster admitted that, if the properties had not been permittable, they were worth $500 before, at and after the taking. However, neither agreed with the Levee District's position that the properties were not permittable in 1989 because they were in limbo at that time. The two *333 experts, on cross-examination, denied that the properties had only wetlands value, in spite of the permit uncertainty.
As an appellate court, we may not modify the factual findings of a trial court unless we conclude that the trial judge or jury was manifestly erroneous, or clearly wrong in the factual determination. West Jefferson Levee District v. Mayronne, 595 So.2d at 679. After our review of the testimony and documentary evidence, we conclude that the trial judge was not clearly wrong in his award of compensation for the value of the land taken and severance damages. The critical events were the takings by the expropriation proceedings instituted in 1989. The market values were destroyed by that final act. Until then, the real possibility of a change in the landowners favor existed. Further, the Levee District knew that the property was inherently developable and also that it risked high land-acquisition costs when it accepted the modified alignment E. Both the testimony of the Levee District witnesses and the documentary evidence proved this. Regardless of the LCA, the Levee District took action which forever foreclosed the possibility of development and it is liable for the market value, before and at the time of the taking. Since the Levee District does not dispute the figures on value, based on the developability of the land as testified to by Hartwell and Brewster, these awards should be affirmed.
Even if we were to agree with the Levee District that the value of the land was nominal, both before and after the taking, we would still reach this same conclusion, because the inability to get a permit or develop the land prior to the takings was wholly the result of governmental (all of the entities which combined to halt the project) control and in no way the result of landowner action. It was governmental action which arguably devalued the property, which was developable except for the interference of the levee project. The landowners' dreams of development were shattered, not by the expected or everyday risks of property ownership, but by a factor within the exclusive control and discretion of the governmental entities involved in the levee project. It is patently unfair and unconstitutional to penalized the landowners for the effect of these governmental restrictions by refusing to compensate them for this injury to the full extent of their loss. Thus, under every analysis of this case, we find that the landowners are entitled to be compensated by the appropriate parties according to values set forth by the trial judge, which we have already found not to be manifest error. We, therefore, affirm the awards of compensation for value of the land taken and severance damages to BDF, Coast and the Isaacs.
Certain questions must be answered before an award for delay damages can be maintained. First, was there a delay in the project? Second, was there a reasonable expectation that the project would receive a permit? Third, what was the period of delay? Fourth, who is legally responsible for the delay? And finally, what is a fair and reasonable calculation of the loss suffered as a result of the delay?
Dr. Ragas, a real estate and financial analysis expert, was called to testify as to delay damages. He analyzed various factors to arrive at the 10% per year simple interest figure which was eventually awarded by the trial judge. He considered the changing economic conditions in the area, both the earlier downward trend and the more recent upward recovery, return on investments during the ten years ranging from yields of 7% to 10% and the entrepreneurial profits that the landowners could have expected to earn had the development proceeded as planned. Dr. Ragas stated that the final determination of the levee alignment was the crucial element in the development of the levee. However, he also stated that the uncertainty could cause the value to be reduced and that until the alignment was chosen and the levee alignment fixed, the assignment of value would be difficult.
In answer to the first question, the trial court found that there was a delay and he assessed damages against the Levee District. The evidence shows that the project was delayed, actually stopped, by the cease *334 and desist order and by the permit denial. Therefore, we find that the trial court was not manifestly erroneous in its holding.
Like the Mayronne case, both sides herein introduced extensive evidence, including the testimony of experts, concerning whether there was a reasonable expectation that the landowners would receive a permit for their project. Dr. Gagliano testified that, "This was a serious well coordinated planning process and project that was well funded and would have been well implemented had it not been disrupted by the cease and desist order." In response to the question, "In terms of the landowners reasonable expectations by December of 1975, was there anything out there that should have changed their expectation that they should have been allowed to proceed with their development." Dr. Gagliano responded, "No. I think that they could reasonably expect that the project could be completed ..."
The trial judge considered the totality of the evidence and concluded, after a six day trial, that there was no legal impediment, including its permitability, to the development prior to the actual takings. After our review, we do not find manifest error or that the trial judge was clearly wrong in finding the land developable prior to the takings.
We will next consider the period of delay. The trial court found that the delay damages began on September 21, 1979 (the date that the Corps denied the landowners a permit to develop the properties and the date from which the landowners prayed for delay damages). The evidence supports this finding. Thus, we find that the trial court was not manifestly erroneous in determining the period of delay.
Next, we will consider who is legally responsible for the delay. The trial judge found that the Levee District was responsible for the delay damages for the entire period. We find no manifest error that the Levee District is responsible for some part of that delay. However, we find that the trial court decision holding the Levee District responsible for the delay damages from 1979 was manifestly erroneous.
The Levee District cannot be held responsible for delay damages before they were responsible for the levee construction. That occurred on September 11, 1985, the date the parish passed the resolution transferring responsibility to the Levee District for construction of the levee. Not until then did the Levee District have the authority to exercise control over the status of the property. We also find no evidence that the Levee District acquired responsibility from any other party at any other prior time. Therefore, we affirm the judgment of the trial judge that the Levee District is liable to the landowners for the delay damages. However, we amend the judgment to award delay damages against the Levee District from September 11, 1985.
We will next consider what is a fair and reasonable calculation of the loss suffered as a result of the delay. Accepting the testimony of Dr. Ragas, the trial court found that said damages are due at the rate of 10% per year simple interest on the difference between the amount deposited and the amount awarded. The testimony by Dr. Ragas was uncontroverted and credible. Therefore, we find that the trial court was not manifestly erroneous in its finding.
Because we have amended the award on delay damages, the award of attorney fees must also be amended to conform to the trial judge's award of 25% of the difference between the amount deposited and the amount awarded. See: La.R.S. 38:387(E). While we point out that the Levee District did not appeal the attorney fee award, thus we need not consider that issue,[7] we also note that we have reviewed it and find no manifest error based on the record and legal criteria. See: La.R.S. 38:387(E); State, DOTD v. Williams, 597 So.2d 439 (La.1992); State, Dept. of Transp. v. Hecker, 493 So.2d 125 (La.App. 5th Cir.1986).
*335 Accordingly, the judgment of the trial court is hereby affirmed as to the awards of compensation to the landowners for the value of the land taken and severance damages. It is hereby amended to award delay damages to the three landowners from September 11, 1985 in the amount of 10% per year simple interest on the difference between the amount deposited and the amount awarded until February 15, 1989 for BDF, until June 30, 1989 for the Isaacs, and until July 12, 1989 for Coast.
The award of attorney fees is amended to 25% of the difference between the amount deposited by the Levee District in these three consolidated expropriations and the amounts awarded under this decision.
The judgment of the trial court is otherwise affirmed.
The Levee District is to pay the costs of appeal.
AFFIRMED IN PART, AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] September 16 through September 20, 1991 and September 28, 1991.
[2] The amendments of 1972 and 1977 to the Federal Water Pollution Control Act became known as the Clean Water Act. The Clean Water Act is found in 33 U.S.C. § 1251 et seq.

The pertinent regulatory provisions are found in 33 CFR § 320 et seq. and 40 CFR § 230 et seq.
The Rivers and Harbors Appropriation Act was amended in 1976 and is found in 33 U.S.C. § 403.
[3] 33 U.S.C. § 403 and 33 CFR § 320 et seq.
[4] Federal funding had been an off-and-on-again possibility since 1965. Further, federal water development projects were averaging 26 years for completion. Thus, the parish permit was requested as a purely local project.
[5] We note that in a case involving another landowner, West Jefferson Levee District v. Mayronne, 595 So.2d 672 (La.App. 5th Cir.1992), writ denied, 605 So.2d 1094, (La.1992), the Levee District did not contest its legal liability to pay the compensation, just the amount of compensation.
[6] Dr. Gagliano was qualified as an expert in the § 404 and § 10 permitting process, in conjunction with his expertise in coastal and alluvial geology, land resource and coastal management of natural systems, regional planning, environmental processes, mariculture, agriculture and archaeology.

Dr. Krebs was qualified as an expert in civil engineering and land surveying.
[7] See: La.C.C.P. art. 2082; Uniform Rules, Court of Appeal Rule 2-12.4; United Talent Asso. v. Parish of Jefferson, 457 So.2d 1293 (La. App. 5th Cir.1984), writ denied, 462 So.2d 653 (La.1985).