595 So.2d 672 (1992)
WEST JEFFERSON LEVEE DISTRICT
v.
Oswald Harry MAYRONNE, et al.
No. 91-CA-87.
Court of Appeal of Louisiana, Fifth Circuit.
January 31, 1992.
Rehearing Denied April 16, 1992.
*674 Harry C. Stumpf, Stumpf, Dugas, LeBlanc, Papale & Ripp, and Owen J. Bordelon, Jr., Gretna, for plaintiff-appellant West Jefferson Levee Dist.
Cleveland, Barrios, Kingsdorf & Casteix, Carl W. Cleveland, Dawn M. Barrios, Bruce S. Kingsdorf, New Orleans, for Oswald Harry Mayronne, et al.
Before FINK, J. Pro Tem., WICKER and GOTHARD, JJ.
ELORA C. FINK, Judge Pro Tem.
This is an expropriation action in which the plaintiff, West Jefferson Levee District (hereafter called the Levee District), appeals the amount of the award to the landowners. The defendants are the Succession of Agatha Mayronne and the heirs of Harry Mayronne, to wit: Oswald Harry Mayronne, George J. Mayronne, Jr., Agatha Mayronne Haydel and Huey J. Mayronne. We affirm the award, for the reasons that follow.

PROCEEDINGS IN TRIAL COURT
On March 6, 1987 the Levee District instituted expropriation proceedings against the defendants under the "quick taking" statute, LSA-R.S. 38:351, et seq., which authorizes a levee district to acquire property for levee purposes prior to judgment. The "taking" involved a servitude over approximately 46 acres of a 196-acre parcel of land designated as wetlands by the U.S. Army Corps of Engineers, a designation to which the parties stipulated. The property fronts on Lapalco Boulevard in Jefferson Parish on the West Bank of the Mississippi River.
Prior to trial the Levee District deposited the sum of $72,855 into the court registry as compensation for the expropriation. (This sum equated to 3.6 cents per square foot.) In July 1990, a six-day jury trial commenced. Following the trial, the jury awarded the Mayronne family $992,902 for the value of the land taken by the servitude and $300,917 in severance damages to the remainder, subject to a credit for $72,855, the amount previously deposited by the Levee District. Thereafter the Levee District appealed.
On appeal the Levee District first asserts the trial judge erred in denying its motion for judgment notwithstanding the verdict (judgment N.O.V.) because the jury award was excessive based on the evidence. The Levee District further asserts the trial judge erred in failing to grant its "Motion for Judicial Notice of Adjucative Facts and Legal Matters and to Exclude Evidence in Contravention Thereof." Third, it contends the trial judge erred in allowing the jury to view the property over its objections.
The Mayronnes have answered the appeal and seek an increase in the award.

FACTS
The evidence established that between the nineteen-sixties and the nineteen-eighties, public authorities became aware a hurricane protection levee was needed on the West Bank of the Parish of Jefferson. The Parish conducted studies and held public hearings to determine the best location. The Mayronne property was included in the tracts of land studied as a potential site.
In 1977 the federal Clean Water Act came into existence through amendments to the Federal Water Pollution Control Act, now found in 33 U.S.C. § 1251, et seq. Under the Clean Water Act, the Rivers and Harbors Appropriation Act33 U.S.C. § 403 (1976)and 33 U.S.C. § 1344 (providing for permits), the U.S. Army Corps of Engineers (hereafter called the Corps) became the agency regulating the discharge of pollutants into navigable waters. The definition of "navigable waters" eventually was expanded to include wetlands. As a result of this expansion of the term, a permit from the Corps of Engineers is required in order to disturb wetlands for any purpose. 33 C.F.R. § 320, et seq., and 40 C.F.R. § 230, et seq. This permit is referred to as a 404 permit, after the section *675 of the Clean Water Act requiring it (now found in 33 U.S.C.A. § 1344).
If the work is on property determined to be navigable waters of the United States or affects such property, it further requires a permit under § 10 of the Rivers and Harbors Appropriation Act of 1899 (33 U.S.C.A. § 403) and 33 C.F.R. § 320, et seq. Those permits are regulated by the Coastal Management Division of the Louisiana Department of Natural Resources. Both the Corps decisions and Coastal Management's decisions are subject to veto by the federal Environmental Protection Agency under § 404(c) of the Clean Water Act, 33 U.S.C. § 1344.
In 1981 several alignment choices for the levee system were presented to the Corps for approval by various parties, designated at trial of this matter as Alternative Alignments A through G. Alternative Alignment D was submitted by the Parish of Jefferson for the Levee District. Prior to this time the Corps had determined the Mayronne parcel to be wetlands. Each of the alignment choices included most of the Mayronne plot within the protected side of the levee system.
In 1984 the Corps completed its alignment studies. It rejected the alignments submitted by the various parties and the Parish. Instead, the Corps recommended an alignment of its own devising, referred to as Modified Alternative Alignment E, which was chosen because it had the least impact on wetlands. The Corps' report stated it recognized the Parish's interest in enclosing large portions of wetlands for future development, but found no need for further development at that time.
The alignment chosen by the Corps provided that the levee would be built on the eastern and northern boundaries of the Mayronne tract. The effect of the alignment placed part of the levee along the boundary which fronts Lapalco Boulevard, essentially blocking access to the Mayronne property from this heavily-trafficked highway, and placing most of the Mayronne property outside the flood-protected area.
In October 1985 Hurricane Juan struck the New Orleans area, resulting in severe flooding on the West Bank. The areas most affected included the Mayronne tract and nearby Lincolnshire and Westminster, moderate-income residential subdivisions. As a result, in 1986 the Parish accepted Alignment E and a permit to construct the levee was issued. The permit was thereafter assigned to the Levee District and construction commenced, beginning with expropriation of servitudes on the land over which the levee was to be built.

DENIAL OF JUDGMENT N.O.V.
The Levee District argues the trial judge erred in denying its motion for judgment notwithstanding the verdict. A judgment N.O.V. should be granted where the trial court is convinced that, under the evidence, reasonable minds could not differ as to the amount of damages. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986).
At issue is the effect of the expropriated property's wetlands designation on its potential development value. This involves both the value of the wetlands property taken and the value of severance damages due not only for the expropriation of the servitude, but also because of the economic damage to the property remaining on the protected side of the levee. Both values depend upon the probability that the Corps would have issued a permit allowing the Mayronne property to be developed despite its wetlands status. If the property was "permittable" and thus could be developed to its best and highest use (commercial in the front, residential to the rear and wetlands to the extreme rear), the property value would be $4,000-$14,000 an acre, compared to $500-$1,500 as undevelopable wetlands.
In this respect, the Levee District contends it was unlikely the owners of the tract could have obtained the necessary permit or permits at the time of the taking. It asserts the Mayronne family failed to show it would have met the criteria set forth in the Corps regulations for approval of wetlands development. Specifically, the *676 Levee District contends the Mayronnes did not prove they would have been able to show a need for a specific project or show there were no alternative non-wetlands sites or lesser-quality wetlands sites available to supply the specific need. The Levee District relies on trial testimony, denials of similar applications by the Corps, and the differences between this property and others for which the Corps granted permits.

A. Permittability
The Levee District produced the testimony of the Chief of Permits for the Corps in the New Orleans district, Dr. Lloyd Baehr, Jr., and also of Peter Talluto and Irvington Eppling, both experienced real estate appraisers, to show it was unlikely the Mayronnes would have obtained the necessary permits in 1987 to develop the property.

Dr. Lloyd Baehr, Jr.
Although Dr. Baehr stated he could not give an advisory opinion on permit issuance, he explained the criteria for the Corps' determinations. He testified that the regulations are designed not to prohibit development of wetlands, but rather to guide it in the best interest of the public. An applicant thus must show that there is a specific need for the specified project, that no alternative non-wetlands or lesser quality wetlands are available, and that the applicant can provide mitigation by converting some other area to wetlands. According to Dr. Baehr, most permits granted are for small operations related to oil and gas and very fewone percent or less relate to large developments for commercial and residential purposes. He stated that the track record for those permits is not good.
Dr. Baehr explained that if the applicant's property falls within a coastal zone protected by the Clean Water Act, both the Corps and the state coastal regulatory body must agree to issue permits. Further, if an environmental impact statement is required, the time to get a decision on the application would be extended from six months to a year-and-a-half.
Dr. Baehr testified this property had been determined to be wetlands by Dr. John Bruza, Jr., of the Surveillance and Enforcement Unit, Corps of Engineers; it is part of the Barataria estuary system, which is influenced by the tides of the Gulf of Mexico, and is a semi-permanently flooded swamp. He explained it is high-quality wetlands with fisheries and wildlife value, as well as flood-storage capacity. In addition the particular tract at issue also has storm-surge protection value. He noted the permittability of a development would not be influenced by the fact it was within or without levee protection.

Peter Talluto/Irvington Eppling
Both Peter Talluto and Irvington Eppling testified it was unlikely the Mayronnes could have shown a need to develop the property. They testified the area had suffered an economic decline from the oil and gas industry depression, starting in the early 1980's, from which the West Bank has not yet recovered. Thus, they contend, there was no demand in 1987 for new commercial development or for residential development of medium-priced houses, envisioned by the Mayronne experts as the best and highest use of the property.
Talluto asserted there were 8,810 acres of land available for development on the West Bank in 1987, thus negating the possibility the Mayronnes could have proven need or unavailability of appropriate alternative sites. He testified further that although the property would have to be rezoned, the Mayronnes had not taken any action in the past to indicate they intended to develop it. Talluto also explained the nearby Lincolnshire and Westminister subdivisions were built prior to the wetlands permits requirement and should not be considered in the permittability decision.
Talluto testified that after he discussed the permit process with Corps personnel in his investigation relative to the value of the land he concluded the Mayronnes would not be able to obtain a permit at that time, although a permit might be obtainable sometime in the future.
Eppling, testifying as the Levee District's rebuttal witness, cited statistics showing that housing permits and electric *677 meter applications decreased in 1987. He cited other 1987 parish figures demonstrating that the Parish lost 8,000 residents and gained 4,000, resulting in a net population loss of 4,000. In response to the Mayronnes' experts who cited increased sales, he contended those sales were for existing vacant housingnot for housing in new developments. He asserted that although there has been some improvement in the economy, the existing properties would have to be absorbed before new development would be needed. As an example, he referred to a development of moderately-priced homes begun in 1984-85, named American Home Place. There, although the improvements were installed, not one house had been built in the subdivision to the date of trial.
On the issue of permits, the Mayronnes called Dr. Terry Howey, Director of the Coastal Management Division of the Department of Natural Resources of the State of Louisiana, to testify generally as to § 10 permit jurisdiction and procedures. They also submitted the testimony of Dr. Sherwood Gagliano, a recognized expert in wetlands and the permit process; Robert Merrick, owner and President of Latter and Blum Realtors; and Thomas Charpentier, a Latter & Blum appraiser.

Dr. Terry Howey
Dr. Howey explained that an applicant for wetlands development, in addition to obtaining a Corps permit, must obtain a permit from Coastal Management if the wetlands fall within its jurisdiction (lands tidally influenced by the Gulf of Mexico). Wetlands that are enclosed (i.e., surrounded by levees or other natural enclosures) are called fastlands and do not require a § 10 permit. When a Coastal Management permit is required, however, the Corps is prohibited from issuing a permit if Coastal Management denies a permit.
Dr. Howey agreed with Dr. Baehr that the permit processes are designed not to prohibit wetland development, but to manage it and to encourage appropriate development suitable to the environment and to the needs of the state. He stated that the departments receive approximately 1,200 applications per year and that they allow development of approximately 100-200 acres of wetlands per year. On direct examination, Dr. Howey stated that Coastal Management has never denied a permit in Jefferson, Orleans or St. Bernard parishes; on cross examination, however, it was determined it has not granted a permit in those parishes either.
Questioned regarding the likelihood that the Mayronnes could obtain a § 10 permit in the future, he said it was unlikely, since the construction of the levee places the property outside the levee protection zone. On cross-examination, he clarified his statement, testifying the same degree of probability existed prior to the levee construction because the criteria used to determine the appropriateness of the development would be the same.

Dr. Sherwood Gagliano
Gagliano testified that he was involved with the drafting of legislation that created the coastal zone management program in Louisiana. He noted that although the application process was complicated it is unusual for the Corps to deny a permit. It was his opinion that a permit would have been granted. In support of this conclusion he referred to the historical growth pattern of the area, including parish street plans, the existing nearby developments, the appropriateness of the soil for drainage and fill, and the availability of an established nearby city with its city services. He stated that long-term trends show the Mayronne plot is within the best area for commercial and residential development and would be the first choice for development.
Dr. Gagliano testified the Corps' rejection of the Parish's original alignment proposal cannot be construed to indicate the Mayronne permit applications would have been denied. He pointed out that the rejected alignment affected a much larger land area, since it involved the entire proposed levee system. Normally, he stated, the Corps representative would walk the land of a property owner with the applicant and/or his consultant to determine soil *678 type, vegetation, etc., as part of the decision-making process.
Dr. Gagliano pointed out another unique feature of the property: He testified that the required mitigation (i.e., conversion of other land into wetlands to make up for wetlands developed) is simplified in this case because the subject property itself has areas which can be used for mitigation. He stated that the permit denials on which the Levee District relies involved isolated wetlands or waterfronts. In addition, he said that the ratio of permits denied to those granted is generally low. Dr. Gagliano referred to five permits granted by the Corps which he believed were comparable.

Robert Merrick
Merrick testified that he relied heavily on Dr. Gagliano's opinion as to the permittability of the Mayronne tract. Because he had never been involved in the permitting process, his valuation of the property was based on a review of five permits granted in the area and the assumption that a permit would have been obtainable. Although he did not review any denials, he asserted he was able to evaluate the process and likelihood of obtaining a permit due to his extensive experience and close observations of the marketplace over many years. Merrick testified the permit would have been granted because the property is unique: it fronts a busy four-lane highway, it is in the path of natural and historic growth, and the Corps has never denied a permit for urban property located adjacent to a four-lane highway. These factors indicated to him that it was likely the property would have been developed within three to five years.

Thomas Charpentier
Charpentier testified he has appraised thousands of acres of wetlands and has previously qualified to testify regarding permittability. He agreed with Merrick that the property's unique characteristics would have played a large part in the Corps' decision, had the Mayronnes filed for a permit. He pointed out that 30,000 to 35,000 cars pass the property daily, it is in the path of West Bank growth, and it is surrounded on three sides by development (the old Westwego Airport, the Lincolnshire and Westminster subdivisions, and Lapalco Boulevard). He emphatically disagreed with the Levee District's contention that there are numerous acres remaining to be developed on the West Bank; rather, he stated, there are only 600 acres of non-wetlands remaining for development and the Levee District's figure of 8,810 relates to the entire East Bank and West Bank areas.
Each side presented testimony from its experts regarding the permits granted and denied. Each side attempted to distinguish the applications on which the other relied. Out of 14 application denials introduced by the Levee District, three were for properties near the Mayronne tract. The five permitted developments were located in New Orleans, St. Charles, Jefferson and St. John parishes.
The three denials located nearby took place in 1985, 1987 and 1990. The first was an application by W.J. Elmer for expansion of a trailer park, the second an application by East Group Properties for development of 1,000 acres on the Lafitte-LaRose Highway, the third an application by C.I.T. Corporation for development of a 461-acre tract adjacent to the Mayronne property. In each of those cases, the Corps determined there was no need for development shown and/or there was no showing other appropriate sites were unavailable. The Corps' reports contained statements to the effect that there were 8,810 acres of non-wetlands property available (a determination which the Mayronne real estate experts hotly contested) and that the developments envisioned would not be needed until the year 2012.
The Elmer property had been filled with dirt before an application was made. The East Group site had been drained and placed under pump and within the enclosure of a poorly-maintained levee. The C.I.T. parcel, like the Mayronne piece, was surrounded by a spoil bank (a buildup of dirt from canal dredging) with breaches in the bank to allow tidal flow.
The five permits granted involved English Turn on the West Bank in Orleans *679 Parish and minor developments in the other parishes. The Mayronnes relied heavily on the English Turn permit application. The parcel is a high-income housing development surrounding a P.G.A./Jack Niklaus-designed golf course. The evidence indicated the wetlands involved in all five were of poorer quality than the Mayronnes', were already adversely affected, or were drained and under pump. None required an environmental impact statement due to the minimal effect on the environment.
The real estate appraisers testified regarding the probability that the Mayronnes would have developed the property in the "not too distant future" from 1987. The Mayronne experts stated the potential was three to seven years; the Levee District experts felt it would have been much longer, given the economic conditions.

The Landowners
Agatha Mayronne Haydel and her husband, Gerald Haydel, testified as representatives of the landowners' interests. Both testified that the Mayronne family had intended to develop the property, but was waiting to see where the levee was going to be placed. They stated the landowners had executed an oil lease in 1960 which placed restrictions on surface activities to protect the property for future development. They testified further that they had hired an architect in 1972 to analyze the possibility of developing the property, but that he advised waiting at that time. The Haydels stated they heard about the proposed levee construction and made inquiries to the Corps, but received no response. They said they could not go forward with active measures to commence development, including applying for the necessary environmental permits, because of the uncertainty about the placement of the levee.
In an expropriation case, the landowner is entitled to compensation to the full extent of his loss. LSA-R.S. 38:387(C). Just compensation is based on the market value of the land taken, which is its best and highest use as of the date of the takingin this case, the date the estimated compensation was deposited into the court registry. LSA-R.S. 38:387(A). Severance damages are also due when the taking has adversely affected the value of the remainder of the property. LSA-R.S. 38:387(B). Severance damages are measured by the difference between the value of the land prior to the taking and the value after the expropriation, after considering the effects of the completion of the project in the manner proposed or planned. LSA-R.S. 38:387(B).
In this case, both sides introduced extensive evidence and the testimony of highly respected experts and witnesses involved in the permit process. The jury, presented with six days of this evidence and testimony and taken to view the Mayronne property before trial, apparently concluded the Mayronne family would have been granted a permit in 1987, since its award is commensurate with that finding. As the appellate court we can modify that factual finding only if we determine the trial court committed manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979); Hospital Service Dist. No. 1 v. Guillot, 482 So.2d 765 (La.App. 5 Cir.1986).
Our review shows that not only is the Mayronne property in the immediate path of West Bank development, but also it is surrounded by residential and commercial enterprises and it fronts on a busy highway. It is evident the Mayronnes were precluded from applying for permits until the levee system problem was resolved, but that they intended to do so. The evidence shows the Corps and Coastal Management employees make permit determinations on a case-by-case basis. Thus, given the urban location of the Mayronne property, the West Bank's recovering economy, increasing sales, and the other factors testified to by the witnesses, we conclude the jury did not err in finding the property would have been permittable in 1987 despite its high-quality wetlands.

B. Valuation
The next question, then, is whether the jury erred in its valuation of the property taken and of severance damages due. Assuming *680 permittability, the real estate appraisers all agreed the highest and best use of the Mayronne property would be for commercial development along the highway frontage (8.8 acres) and construction of moderately-priced residential housing behind the commercial area, leaving it as wetlands to the rear. They all recognized the landowners would have incurred expenses to build a levee behind the residential section to protect it from tidal flow and to drain, fill and grade the development parcel. They recognized the delays incurred for the permit and rezoning process would also affect the value.
Merrick and Charpentier divided the acreage into approximately 350 square feet on Lapalco, with 126 acres behind for the residential portion and 24 acres to the rear for wetlands. They considered comparable residential sales in the area, statistics of traffic flow, population growth, land absorption, the development pattern in the direction of the tract, the proximity to other developments and availability of city services. Balanced against those factors were the significant development expenses and the time lag for permits and rezoning. They concluded the commercial property was worth $2.50 per square foot, the residential section worth $5,000 per acre and the wetlands $500 per acre.
Richard Brewster, called to testify on behalf of the Mayronnes, was hired to review the Latter and Blum conclusions. Brewster agreed with Merrick and Charpentier except for the residential section. He valued that portion at $14,000 an acre.
On the issue of severance damages, Merrick, Charpentier and Brewster asserted the property was virtually useless because the levee acts as a barrier to development. They explained no developer would consider developing property behind a protection levee. Merrick and Charpentier thus valued the damage to the remainder of the property at $387,000. Brewster estimated the value at $1,160.00.
The Levee District's expert, Talluto, based his values on comparable swamplands and on the facts that no negotiations or written offer had been made to buy the property, no market demand existed at the time, no specific plan had been made to convert adjacent or nearby property to similar uses, and preparation of the land for development would be high-cost. Noting that the taking was of a servitude and not of the property itself, he concluded the property was worth $72,855.
Talluto testified that no severance damages were due because the property was the same wetlands as before the taking, which are enclosed by a spoil bank or small levee. He stated a levee would have to be built to the rear to develop it regardless of the parish levee along the front, and that the Levee District construction could be removed in the future if the owners could get a permit to develop it. (In this regard Leo Duett, a Levee District employee, testified the Levee District would permit construction of crossings over the levee based on need, if the applicant followed its requirements.)
As factors in his evaluation Eppling cited the soft real estate market of 1987, the lack of demand for new development, poor sales of existing vacant housing, and the expenses for preparing the property. He stated consideration must be given to the permits process, legal and engineering fees, the zoning change procedure, ad valorum taxes, sales expenses of the new development, and the costs of digging drainage canals, installing pumps (needed for a few years following development due to soil subsidence), and depositing fill to replace soil which subsides after a few years. He stated a developer would have faced the risk of not getting a permit. He noted there are existing subdivisions which a developer could have purchased with less risk.
Eppling disagreed with the methodology used by the Mayronne experts to calculate value, including the twelve percent discount rates. He stated eighteen percent was appropriate, considering the reality of the situation in 1990, and that 10 years from 1987 is a more realistic time span for the property to be needed in the area. He agreed, in conclusion, with Talluto's value.
*681 The Haydels also testified in regard to value. They asserted the servitude was harder to accept because the Mayronne family still had to pay taxes on the whole property. They asserted property taxes on the tract were approximately $15,000 per year, based on ten percent of the assessed value of over one million dollars. On cross-examination, however, they admitted they were unaware there are lower-rate special use tax rates on swampland for which they could have applied to reduce the obligation.
The highest and best use of property involved in an expropriation suit is that to which it is best adaptable in the not-too-distant future and which is not speculative or remote. State, DOTD v. Fakouri, 541 So.2d 291 (La.App. 3 Cir.1989), writ denied, 544 So.2d 405 (La.1989).
Some of the factors which may be considered in the determination are:
(a) Costs to clear and prepare the land for the particular purposes (State, DOTD v. Fakouri, supra);
(b) Proximity of the land taken to areas already developed in a manner compatible with the use proposed;
(c) Some action already taken to develop the land for the use in question;
(d) A scarcity of land available for the use;
(e) Use permitted by the zoning ordinance of the parish or city in which the land is taken is located;
(f) Use to which the land is put at the time of the taking; and
(g) Existence of offers to buy the property by those interested in developing it for the intended use.
Hospital Services Dist. No. 1 v. Guillot, supra; Town of Rayville v. Thomason, 404 So.2d 1290 (La.App. 2 Cir.1981).
In addition, other factors are the evidence of a market demand in the vicinity for such use and specific plans of businesses and individuals in the area, including action already taken to develop the land for that use. Louisiana Resources Co. v. Noel, 499 So.2d 1016 (La.App. 3 Cir.1986); State, DOTD v. Fakouri, supra.
The jury here determined the appropriate award to be $992,902 for the taking and $300,917 for severance damages. While we do not know the per-acre figures the jury allocated, we note that the portion for the taking is $370,980 less than the figures proposed by the Mayronne experts and that the portion for the severance damages is $87,000 less. The award is significantly higher than the $72,000 recommended by the Levee District, but that amount appeared to be premised on the Mayronnes' inability to get § 404 and § 10 permits.
Our review of the evidence shows the jurisprudential considerations listed above have been met, for the most part. The jury apparently believed the factors recited earlier in this opinion indicated the Mayronne tract more likely than not was a valuable piece of property which, prior to the taking, had potential for commercial and residential development in the near future. In addition, the jury must have rejected the testimony of the Levee District's expert witnesses in order to reach its conclusion that the severance damages due were $300,917.
On our assessment of the record we are unable to say the jury's credibility determinations leading to these conclusions are clearly wrong, nor can we find their evaluations of the evidence an abuse of the great discretion accorded the trier of fact. We conclude that "reasonable and fairminded men in the exercise of their impartial judgment" might reach different conclusions on this evidence. Therefore, the trial judge was correct in denying the Levee District's motion for judgment notwithstanding the verdict. See Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969).

JUDICIAL NOTICE/EXCLUSION OF EVIDENCE
The next issue raised by the Levee District is whether the trial judge erred in failing to grant its motion for judicial notice and to exclude evidence in contravention thereof. The appellant requested the court to exclude any evidence by the Mayronnes which would put at issue the status *682 of the property as tidally-influenced wetlands, which it asserts was stipulated by the parties. Furthermore, it argues, the jury had no standing to decide the issue, since the determination by the Corps is given great deference and such evidence constitutes a prohibited collateral attack on a federal agency's decision on a matter which is within their sole jurisdiction. Texas Eastern Transmission Corp. v. Bowie Lumber Company, 176 So.2d 735 (La.App. 1 Cir.1965), writ denied, 248 La. 385, 178 So.2d 663 (La.1965). See also, Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5 Cir.1983).
The Mayronnes argue the evidence was not a collateral attack on the status of the land as wetlands. They contend the evidence was produced merely to show the quality of the wetlands and its development potential considering the soil type, elevations, etc.
There was a significant amount of testimony related to elevation, soil type, vegetation, types of trees, standing water, and whether or not there were breaches in the spoil bank. On one hand, these factors are considered by the Corps and Coastal Management scientists when they make their determinations as to whether property is wetlands. On the other hand, the same factors are important in determining the feasibility of developing wetlands, since the definition of wetlands encompasses a broad range, from mainly submerged land to property which is seldom flooded. It was also relevant because the quality of wetlands was put at issue in the permittability portion of the trial when the parties introduced the permits which were denied and granted by the Corps. Consequently, we do not find the trial judge erred in denying the motion in limine and allowing the testimony.

JURY VISIT TO PROPERTY
Finally, the Levee District argues the trial judge erred in allowed the jury to view the property personally. The appellant contends the viewing was prejudicial, confusing and misleading to the jury, since the property had undergone significant change due to construction of the levee. In particular, it asserts the portion on Lapalco was a swampy marsh, not high and dry as it appears now. Although photographs were introduced at trial showing the property prior to the levee construction, it is contended the photos could not correct the original false impression.
The landowners respond that the trial judge adequately cautioned the jury prior to the bus trip to the property and that the numerous photos introduced at trial were sufficient to prevent the jury from being misled, to prevent confusion and to prevent prejudice. They assert, in addition, that the Levee District failed to object at trial and, in fact, that the route by which the jury travelled en route to the site was modified to suit the Levee District.
The Levee District filed an objection which, for some unknown reason, is not filed in the record lodged with this court. On the Levee District's motion we permitted the record to be supplemented with the missing objection, since the copy submitted with the motion shows a clocked stamp by the district clerk's office. Accordingly, we may consider the merits of this assignment.
We have reviewed the record in this matter thoroughly. Although we agree the viewing by the jury was unnecessary and may have had some prejudicial impact, we also find that the six days of testimony and the numerous photographs and other documents introduced, along with the judge's cautionary instructions, served to eliminate possible prejudice or confusion. Accordingly, we conclude the trial judge did not err in denying the Levee District's motion objecting to jury's visit to view the property.

ANSWER TO APPEAL
For the reasons assigned in our discussion of the valuation of the property, above, we dismiss the Mayronnes' answer to the appeal. We cannot find manifest error in the jury's factual determinations regarding the land's valuation, nor do we find an abuse of their discretion in the damages awarded.

*683 DECREE
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are to be paid by the appellant.
AFFIRMED.