GREG G. GUIDRY, Judge.
|sThe Plaintiff, Charles Elmer and his insurer, Third-Party Plaintiff, Essex In *1094 surance Company (Essex), appeal a judgment in favor of West Jefferson Levee District (WJLD) dismissing Elmer’s actions for damages due to inverse condemnation and/or damages due to the construction of public works. We affirm in part and amend the judgment as to costs.
Elmer is the owner of 101.3 acres of wetlands located to the south of Lapalco Boulevard at Victory Drive, in Westwego, Louisiana, that is bounded on three sides by levees. The ‘Westwego levee” is located to the north and east of the Elmer property. The levee starts at the old Westwego Pumping Station. Going west to east, it ends at the western boundary of the Elmer property. The second or “Northern” levee runs along the north border of the property. The third or Westminster-Lincolnshire” (W-L) levee ties into the Northern levee at the eastern Lboundary of the Elmer property. The W-L levee then runs north to south for some distance before turning eastward and continuing toward the Harvey Canal.
The Northern levee was first erected across the northern end of the Elmer property in 1919 from soil deposited from the digging of the “Outfall Canal A,” which was part, of a parish municipal drainage project. That “tidal” levee was raised and repaired periodically by the City of West-wego (the City). In 1940 it was three and one-half feet high. In the 1950’s and 1960’s, the governing authorities intended to raise the levee to six feet, but did not do so until 1985-1986 when the Defendant acted in response to severe flooding in the City from Hurricane Juan in 1985.
The Elmer land has always been outside of levee protection. The land is swampy and marshy, and has always been subject to some flooding from tidal water from the south.[1] Nothing has existed to prevent tidal water from flowing across the Elmer property toward the east and the W-L levee.
The Plaintiffs father, Dr. Charles Elmer purchased this property in the 1950⅛. The Northern levee at that time was approximately four and one-half feet high. In 1964, Dr. Elmer drained part of the property to construct the Westwego Airport, his privately owned seaplane airport, and its seaplane canal. He used the dirt from the canal excavation to increase the elevation of the land around the airport, forming an elevated plateau above the swampy wetlands. A flood gate was also constructed at the southern end of the seaplane canal. The land on the seaplane or eastern side of the canal was higher than the west side. Victory Drive provided access to the property over the Northern levee. That gap was routinely sandbagged by the City of Westwego during high water threats.
IsSometime in the 1960’s or early 1970’s, the Elmer family established a trailer park on the west side of the seaplane canal.[2] Around that time, a ditch was dug along the western edge of the trailer park, and the excavated dirt used to build a raised embankment along that side of the trailer park. At some point before 1985, someone, most likely the Elmer family, constructed a culvert through the Northern levee to drain water from the trailer park into the Forty Arpent Canal. Thus, by 1985, the property around the commercial areas had been drained, the dirt used to elevate the property above the surrounding wetlands, a drainage ditch with a *1095 raised embankment (spoil bank or levee) along west side of the trailer park constructed, a culvert built under the existing levee to drain rainwater from the trailer park, and a flood gate control at the south end of the seaplane canal installed. The property was annexed to the City in 1967. For many years, both of the businesses thrived.
In 1980, the West Jefferson Levee District was created to create, manage, and maintain levees on the west bank of Jefferson Parish.
In 1985, Hurricane Juan struck the area causing severe flooding in Westwego. The hurricane caused some flooding on the Elmer property, but it was minor and the land drained fairly quickly.
Following the disaster to the Westwego residential areas, the Defendant began in earnest to implement a federal levee protection system by raising, repairing, and improving the levees. In 1985 to 1986, the Defendant repaired and raised the Northern and W-L levees to six feet. In 1986, interim levees were built behind the original Westwego and W-L levees.
|fiIn 1986, following numerous studies, discussions and negotiations, the Defendant and the Parish of Jefferson (the Parish) accepted a proposed federal alignment (Modified Alternative Alignment E) for the Federal Hurricane Protection Levee, the permanent levee system. The federal alignment basically followed the original levee alignment, but was set back 150-200 feet from the original and interim levees. In 1987, the Defendant expropriated the properties on either side of the Elmer property for this purpose, but bypassed Elmer’s land.
From 1998 through 2002, the levees were “lifted” or raised twice. The north-south portion of the W-L levee was lifted in 1989 and 1998. In 1998 and 2002, the Defendant constructed the first and second lifts of the Westwego levee and the west-east portion of the W-L levee. The Elmer property was now outside the updated levee protection system, and surrounded on three sides by levees higher than the ones that existed before 1985.
In 1989, Elmer’s insurance agent informed him that the new levees would eventually cause the airport to flood. Elmer closed the Westwego airport, because he could no longer afford insurance on the property. In April of 1991, unusually heavy spring rains and winds forced water from the surrounding wetlands and bayous onto the property and up against the Northern levee causing severe flooding in the trailer park. As a result, Elmer closed the trailer park in 1991.
PROCEDURE
In February of 1989, the Plaintiff filed an inverse condemnation suit against the Defendant. In April of 1991, following the devastation to the trailer park from the spring rains in April, the trailer park residents filed suit against Elmer and his |7insurer, Essex Insurance Company (Essex) for damages.[3] The two cases were consolidated.
In 1993, Elmer filed a third-party action against the Defendant for contribution and/or indemnity in the trailer park suit. In 1994, Essex filed a third-party demand against the Defendant for indemnity following settlement with the trailer park residents. Subsequently, Elmer amended his suit several times to add items of damages, to name the City and the Parish as Defendants, and to allege the negligence and/or strict liability of the three Defen *1096 dants.[4] The City, the Parish, and the Defendant subsequently filed exceptions of prescription.[5]
In September and October of 2000, the Plaintiffs claims against the three Defendants were dismissed as prescribed. In Elmer v. West Jefferson Levee Dist., 01-248 (La.App. 5th Cir.11/27/01), 803 So.2d 229 we affirmed the dismissal of the Parish and City, but reversed the ruling as to the Defendant on the basis that there was no evidence of the date of acceptance and completion of the levee project as required for the applicable prescriptive periods to commence.
After the remand, the case was set for trial on January 26, 2004. In a pre-trial conference on January 18, the trial judge cancelled the trial and requested the parties to brief the affirmative defense of discretionary immunity relative to the issue of the closing of the culvert by the public entities, despite Defendant’s failure to plead it. On January 26, the Defendant filed another exception of prescription solely as to the claim for damages for closure of the culvert. In compliance with the trial judge’s order, the Defendant argued the affirmative defenses of I «governmental discretionary immunity under La. 9:2798.1 involving construction of public works, and under R.S. 29:709 for emergency acts. For the first time, the memorandum also argued the affirmative defense of Act of God. In the Plaintiffs’ opposition memoranda, they argue that the immunity defense should be disregarded, because the Defendant never pleaded it, and no further discovery had been permitted. Essex also objected to the Act of God argument on the same basis, further arguing that Defendant waived the defenses by failing to amend the answer.[6] The issue was briefed and opposed again prior to the trial on the merits. However, the Defendant never formally pleaded the defenses, and the Plaintiffs never filed a motion to continue the trial or filed a formal objection to the defenses.
After 15 years of litigation, a trial was held on January 18 through January 21, 2005, January 24, 2005 and February 22, 2005, following which, a judgment was rendered in favor of the Defendants. In detailed reasons for judgment, the trial judge found that the Plaintiffs failed to prove the levee project caused Elmer’s economical damages, and therefore, they failed to prove inverse condemnation; that in the absence of inverse condemnation, the Defendant had discretionary immunity under La.R.S. 9:2798.1 for any damages; and further that the Plaintiffs failed to prove that Defendant was negligent in constructing the levee system, or in failing to expropriate the Plaintiffs property when it expropriated adjacent land in 1989. The trial judge also found that the Plaintiffs had sufficient notice of the affirmative defenses. Thus, the pleadings had been enlarged. All costs not agreed to by the parties were assessed against the Plaintiffs.
*1097 |90n appeal, the Plaintiffs assert that the trial judge erred in failing to find that Elmer’s economic damage was caused by the Defendant, in her alternative finding that the Defendant is immune from liability, and in finding Plaintiffs did not bear their burden of proving negligence. The Plaintiffs also contend that the trial judge erred in the assessment of certain costs against them.
CAUSATION
In determining whether a party is entitled to damages for inverse condemnation,[7] negligence under either La.C.C. art. 2315, or strict liability under La.C.C. art. 667 and 2317, the Plaintiff must show that the conduct by the public body caused the damages. The trial judge concluded that the Plaintiffs failed to carry their burden of proof that the Defendant’s actions caused Elmer’s damages. In the absence of causation, there can be no liability under any theory of law.[8]
The evidence showed that, in April of 1985, prior to Hurricane Juan, Dr Elmer attempted to obtain a permit to fill in more of the wetlands to extend the trailer park. The U.S. Army Corps of Engineers (Corps) denied his request. Nevertheless, Dr. Elmer proceeded to dump fill on the southern end of the park without the permit. When the Corps found out, it informed Dr. Elmer that the Impermit was again denied, that the fill was illegal, and ordered him to return the land to its original state.
In December of 1986, Dr. Elmer transferred the property to Dr. W. Jay Elmer, Lucille Elmer, Jay W. Elmer and Charles Elmer. The Plaintiff here, Charles Elmer, subsequently obtained 100% ownership in 1987 and 1988.
Geneva Grill, an employee of the Department of Transportation and Development (DOTD), the State agency overseeing the Defendant’s constructions, testified as an expert in civil engineering, hydraulics, levee design and construction. She surveyed all of the Jefferson Parish westbank levees in 1983. Grill testified that continuous work was performed on the Westwego and Westminster levees from 1983 through 1985 to rid them of trees and to raise them to six feet plus above the land around them. In 1985, she became the principle levee advisor to the Defendant.
According to Grill, the westbank levees were in disastrous shape after Hurricane Juan. It was imperative the Defendant act immediately to start work on the federal levee construction, because the Federal Emergency Management Agency (FEMA) was threatening to remove flood insurance *1098 and place a moratorium on westbank construction, and because the westbank had sustained severe flooding creating an emergency. As the emergency work began on the deteriorated levees, Grill worked with FEMA., the Corps of Engineers, the Parish, and others on the federal levee system plans. The areas most in crisis were given top priority. All of the construction then and later complied with federal levee height requirements of 7.5 or 7.5 plus feet.
Grill also testified that the money situation was grim during this period. There was little local or state money to build the levees. And, pre-hurricane State funding had been reallocated to build a flood wall along the west side of the U Harvey Canal, a project that had a completion deadline and preempted the work on the levees. Furthermore, her workers were stretched thin. Other than raising the Northern levee in front of the Plaintiffs property, work on that part of the levee was not a top priority, because the road accessing Elmer’s property was narrow and easily sandbagged during high water situations. In addition, the Defendant was planning to construct flood gates at the Elmer property so as not to interfere with the businesses. Since this plan would have been more expensive and complicated then constructing an earthen levee, and since no other commercial establishments were located behind the levees, the work near the Elmer property was delayed. However, that plan was eventually rejected. Under the new plan, an earthen levee with an access road to the Elmer property was to be constructed. Grill pointed out that Elmer never lost access to the property at any time.
Ron Besson, the Defendant’s President from 1980 to 1990, was also administrative assistant to a Parish councilman from 1996 to 2004. During his tenure as President, he attempted more than once to convince the federal government to permit a levee alignment that would include the Elmer property. The Corps refused. Since continued objection to proposed federal alignment “E” would have delayed the critical work, the Defendant acquiesced to the construction of the federally proposed alignment. That alignment excluded the Elmer property from levee protection.
According to Ernest Tassin, former Westwego mayor, alderman and WJLD executive director, the Elmer family took no interest in these negotiations, despite Tassin’s attempt to involve them.
In 1987, the United States Congress authorized the Federal Hurricane Levee Protection System Alignment E from the Harvey Canal on the east to Lake Ca-taoutche on the west. The alignment followed the old levee. According to the 112witnesses, the Defendant, as the local partner in the project, had to move as fast as possible. In order to obtain necessary federal funds and credit for local monetary contributions, the Defendant had to design the system to federal standards. They used the old footprint where possible, and a non-wetlands footprint when it could not. The federal alignment required the West-wego and W-L levees to be constructed on a new footprint behind the original levees for stability. Once the reach of each levee was designed in accordance with the federal criteria for stability and soil conditions, the width of the rights of way were determined, and expropriation proceedings started.
In 1987, the Defendant expropriated land along Lapalco Boulevard adjacent to the Elmer property to construct the interim levees. It did not expropriate the northern portion of the Elmer land, because, according to Geneva Grill, that area was to be addressed later in the project.
*1099 In May of 1987, the Defendant notified the Elmer family that the property was left outside of the protection levee because the Environmental Protection Agency (EPA) declared it to be wetlands and would not allow it to be permitted for levee construction.
In April of 1991, unusually heavy spring rains, up to 13.38 inches, fell in the area, causing flooding in the trailer park, but minor, if any, flooding in the areas on the protected side of the reconstructed levees.
Ernest Tassin testified that, when Dr. Elmer sought building permits to establish the trailer park in the 1960’s, the City and the Parish, as the drainage authority, required him to construct a levee around the trailer park to protect it from flooding. Tassin testified that in order to obtain the necessary permits, Dr. Elmer agreed to build and maintain the levee. Tassin admitted that there were no written documents supporting that assertion. Nevertheless, the evidence is |13uncontested that Dr. Elmer did dig a ditch on the west side of the trailer park around that time. According to Tassin, Dr. Elmer built the Elmer levee from the ditch spoils, and that it ran north to south from the Northern levee and continued around the southern boundary of the property. Tassin testified that over time the Elmer levee subsided and deteriorated, as would be expected in swampy land.
Charles Elmer disputed the testimony that his father was required to build a protection levee. He testified that there is no governmental requirement to construct a levee around a commercial enterprise that might be subject to flooding. He insisted that the so-called levee was in reality a spoil bank from the ditch project and was never intended to act as levee protection. Further, he claims that Dr. Elmer did not construct a “hydraulic system” for the protection of the trailer park. Although Elmer admitted that sometime before 1985 someone constructed a culvert through the Northern levee, he denied building the culvert. Nevertheless, it was an illegal construction, and the City routinely closed it and the Victory Drive access gap with sandbags when high water threatened Westwego. The Plaintiff admitted that one time he used dynamite to reopen the culvert after the City officials closed it so that his property could drain again.
Elmer also contended that the Defendant overlooked his property in the expropriation proceedings in 1987 in order to devalue it, and thus, reduce the Defendant’s cost of eventually expropriating it. He pointed to the large amount of money adjacent landowners received in the expropriation of their properties based in part on their location next to Elmer’s commercial enterprises. He referred to a letter written in January of 1995 by Owen Bor-delon, Defendant’s legal counsel at the time, in which Bordelon expressed his concern about the cost of this litigation and the cost of potential severance damages in an expropriation of Elmer’s property, considering its value and history of commercial use.
| uThe Flood Events
Coralee Allen, the wife of the park manager, James Allen, lived there from 1984 until it closed in 1991. She stated that the trailer park never flooded severely prior to the work on the levee system following Hurricane Juan. Rainwater drained quickly, as did the minor flooding of 2.5 feet from Hurricane Juan.
Following the hurricane, the trailer park residents complained to Tassin that the Elmer levee sustained a breach and water was flowing into the trailer park through the gap. Tassin walked the levee, and observed water encroaching on the trailer park. He referred the tenants to Dr. El *1100 mer, and notified the park manager, informing him that Elmer was responsible for repairing and maintaining the levee.
Although the gap in the Elmer levee appeared during or shortly after Hurricane Juan, that breach apparently did not contribute to any significant flooding. However, the Plaintiffs attorney, Frank Zacearía, informed him at some point after the hurricane that the tenants were having difficulty obtaining insurance because of the flooding potential. There was no other evidence that the ebb and flow of the water on the property was more frequent after Hurricane Juan. According to Allen, in the interval between 1985 and 1991 water rose occasionally on the gravel road in the park, but the trailers were never flooded. Mark Gautier, a resident from 1989 to 1991, supported this testimony.
Allen and Gautier stated that when the extraordinary spring rains fell in 1991, the water in the trailer park rose to approximately six feet. The water reached up to the windows of some of the trailers. This was despite the fact that the water level only reached 2.79 feet above sea level on the protected side of the Northern levee. That was two feet less than experienced during Hurricane Juan.
Gautier further testified that in the 1991 event, water poured through a 10 foot breach in the Elmer levee. He and other residents attempted to stop the water 11Bby patching the breach with boards. It worked briefly, but the flooding soon found a way around the boards. This break was approximately 100 yards south of the Northern levee. The water ran from the breach to the Northern levee, where it backed up. He noted that the Elmer levee was overgrown with trees and was not wide enough or high enough to prevent the water from entering the trailer park. Gautier said the water came from the marsh to the west of the trailer park, driven by the winds and the heavy rain. Gautier also said that the Elmer levee sloped downward toward the south, so that there was nothing to keep the water out from that direction, other than debris and rip-rap at the south end of the trailer park. Both he and Allen testified that the water from the 1991 storm came from all directions. When Gautier went back a few years before the trial in this case, he discovered that the trailer park area had reverted to swamp.
The evidence further showed that the area protected by the levees in 1991 did not flood in the heavy rains. Because of that, the governmental entities did not declare an emergency.
Elmer testified that he did not know how often water rose on the property between 1965 and 1985, or between 1985 and 1991. Although he only occasionally visited the park between 1987 and 1991, he noticed more water than before 1985. He did not know how long the water remained, or how often it inundated the airport runway during that time, or before he closed the airport in 1989. Elmer admitted that he did not perform any maintenance, repair or reconstruction work on any portion of the property after the hurricane in 1985. There was no evidence of any regulations that would have prevented the work, but in any event, he never considered the work on the property to be a water protection system.
|1KIn 1991, the culvert going through the Northern levee was ordered closed permanently by the DOTD.
In June of 1991, the Plaintiff closed the trailer park, because he could not prevent the park from continuing to flood. However, he also admitted that the Department of Environmental Quality (DEQ) ordered the closure due to the possible incursion of swamp water into the oxidation system. *1101 The property is now inundated with two feet of water. As wetlands, it cannot be used for commercial purposes.
The Plaintiffs expert geologist, Dr. Mark Kulp, testified that he was familiar with the levees in western Louisiana, but has had only informal conversations regarding the role of levees in the southeastern part of the state as water barriers. In conjunction with the litigation, he visited the Elmer property one time. After his investigation into this matter, Dr. Kulp concluded that the Defendant’s levee constructions after 1985 contributed to the flooding in 1991. According to Dr. Kulp, the new levee system formed a triangle from the levees on the west, north and east of the property, with the trailer park at the apex of the triangle located at the northern boundary. He testified that this created a funneling effect which forced rising water onto the Elmer property from the wetlands, and that the higher levees caused the water to back up at the apex of the triangle. Dr. Kulp stated that wind, rain, wave and tidal effect also contributed to the 1991 flooding. However, he did not believe the breach of the Elmer levee caused the flooding at that time, because the levee ran north to south, and the rising water came from the south. Dr. Kulp stated the water would have had to come from east to west for the Elmer levee to have any effect on protecting the property. He did not comment on the testimony of Allen and Gautier who said that the water came in from all directions, in particular from over the Elmer levee to the west of the trailer park. Dr. Kulp 117aIso did not comment on the incursion of water on the land between 1985 and 1991, or between 1991 and the present. Although he indicated that this effect has been seen in another parish in the metropolitan area, other testimony indicated that such a funneling effect has only been observed in Eastern Canada.
Dr. Kulp testified that subsidence was not a factor in this case. In his opinion, any subsidence would have occurred when the property was drained in the 1960’s to construct the airport.
Grill testified that the new levee system greatly enhanced the ability of the people and property on the protected side to survive a storm. She did not believe that Defendant’s levees caused or increased the flooding south of the levee or outside the levee protection system. She felt the flooding that occurred on the Elmer property was due to absence of anything to stop the water coming from the Gulf of Mexico (the Gulf) through the wetlands. She said the rising water in 1991 came from the south and southwest, which means that the property would have been flooded before the water reached the Defendant’s levees. Elmer disputed this. He contended that the winds were from the south. Nevertheless, Grill concluded that water rolling from the Gulf, tidal surge, subsidence and wind caused the Elmer property to flood in 1991. Grill also believed that any owner of property outside the levee system should be responsible for drainage. For this reason, and because Elmer knew that high water events occurred due to its location in the wetlands, and knew that the culvert was closed whenever high water threatened, it was his responsibility to supply drainage for his property.
Grill disagreed with Dr. Kulp about the funneling effect, and with his opinion on subsidence of this land. She discounted the funneling theory, because the water levels measured for the period in question at the various west bank gauges was consistent across the west bank. Since no special dynamics were at |1swork here, as there is in Eastern Canada, there would not have been a funneling effect that would *1102 have caused this problem. Furthermore, based on her experience, continual subsidence of the wetlands soil was a contributing factor in this land’s propensity to flood over the years.
Drs. George Castille and Johannes van Beek, expert geographers with Coastal Environments, Inc., also testified to the cause of the flooding on the Elmer property from 1991 onward. Dr. Castille walked the property in 1999. Based on their analysis, they concluded that the property was enclosed by a levee system, which they termed the “Elmer hydraulic system.” Dr. Castille said that the western part of the property is a cypress swamp, with a mean high water mark at +3.6, based on the height of the cypress knees. He noted there were no knees in the trailer park area. He explained the presence of cypress knees indicates the land is swamp that periodically drains. Although the cypress swamp was at, or a little above sea level, the western edge of the trailer park was 1 to 1½ feet lower due to subsidence. Dr. Castille concluded the subsidence in that area occurred when the property was drained by the construction of the Elmer Canal and levee.
Dr. Castille stated that, in 1999, the Elmer levee ranged from 2 to 3.5 feet in height, with gaps lower than 2.5 feet, and that the more easterly portions of the trailer park were higher due to the plateau development from the airport construction. He testified that these land differences created a bowl-like effect within the trailer park. He further testified that once a levee is placed in a wetland area with high organic soil and the land is drained for that purpose, the ground will sink. He said the higher areas were where the spoil was deposited.
Dr. Castille described the eastern side of the trailer park. He said that the spoils deposited when the seaplane canal was dug created a crest on that side. The eastern crest is near the road and was +2.5 feet high, consistent with the Elmer |1fllevee. However, that ridge is thicker, denser, and more stable than the Elmer levee on the west, which was in poor condition. Dr. Castille concluded that in 1999, the Elmer hydraulic system would have protected the trailer park up to +2.5 feet, except for the fact that there were gaps which dipped below 2.5 feet. Dr. Castille visited the area again in 2003. He testified that both times he visited, the land was flooded. Except for the plateau created by the spoils, the flooding appears to be permanent.
Dr. Castille also disagreed with Dr. Kulp about the funneling effect. In Dr. Castille’s opinion, the breach in the Elmer levee caused the problem. He agreed with Grill that the water came from the south and southwest, and flooded the trailer park before the water reached the Defendant’s levees. Dr. Castille said the only effect the Westwego and W-L levees had was to stop the water that flooded the Elmer property from going into the City of West-wego. He and Dr. van Beek further attributed the flooding to the inadequate height of the Elmer levee for the prevailing water level conditions, the use of improper materials for the construction of the Elmer levee, and the lack of maintenance of the Elmer levee and the Elmer hydraulic system.
The trial judge found that the Plaintiff failed to prove that the levee work by the Defendant caused the damages suffered by the Plaintiff. She found instead that the actions of the Plaintiff in failing to maintain, or repair the existing Elmer hydraulic system, and/or natural weather events, subsidence, geography of the wetlands, and Acts of God (Hurricane Juan and the 1991 spring rains) caused the propensity for flooding after Hurricane Juan, the 1991 *1103 flood, and the permanent inundation of water from tidal flow and rain thereafter. In reaching this conclusion, she adopted the testimony of the Defendant’s witnesses, rejecting the [^testimony of Dr. Kulp that a tunneling effect was created by the Defendant’s levees. She was particularly impressed by the testimony of Geneva Grill.
A trial court’s findings of fact will not be disturbed unless the record establishes that the finding is clearly wrong or manifestly erroneous. Franklin Southland Printing Co., Inc. v. New Orleans Aviation Bd., 99-60 (La.App. 5th Cir.7/27/99), 739 So.2d 977, 981; Lambert v. State Through Dept. of Transp. & Development, 96-160 (La.App. 5th Cir.10/16/96), 683 So.2d 839, 842; West Jefferson Levee Dist. v. Mayronne, 595 So.2d 672 (La.App. 5th Cir.1992); Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. Franklin, 739 So.2d at 981; Stobart, 617 So.2d at 882. Where two reasonable views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Franklin, 739 So.2d at 981; Stobart, 617 So.2d at 882. This standard of review also applies to credibility determinations of expert witnesses. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990).
In this case, both views of the evidence presented were reasonable. Thus, the trial judge’s choice between them cannot be manifestly erroneous or clearly wrong. See: Franklin, 739 So.2d at 981, and Stobart, 617 So.2d at 882. Since we find no error in the trial judge’s conclusion that the Plaintiffs damages were caused by factors other than the Defendant’s levee project, the trial judge was not manifestly erroneous in finding that Defendant is not hable.
In light of our finding that the Plaintiff failed to prove that the Defendant caused the damage, we need not address negligence and damages, and pretermit |aithe issue related to the defenses of governmental immunity since’ the Defendant cannot be held liable under any other legal theories in the absence of causation.[9]
AFFIRMATIVE DEFENSE
The Plaintiffs also argue that the trial judge erred in considering the affirmative defense of Act of God.
An affirmative defense, such as Act of God, must be specially pleaded. See: La.C.C.P. art. 1005. However, the failure to plead will not necessarily exclude such evidence since the purpose of pleading a special defense is to give fair and adequate notice of the nature of the defense so that plaintiff is not surprised. See: Webster v. Rushing 316 So.2d 111, 114-115 (La.1975). Pleadings may be enlarged by evidence adduced without objec *1104 tion when such evidence is not pertinent to any other issue raised by the pleadings and, thus, would have been excluded if objected to timely. Id.; see also: Roberson v. Provident House, 576 So.2d 992, 995 (La.1991); Guirard v. Pelican Pub. Co., 04-1085 (La.App. 5th Cir.1/25/05), 895 So.2d 61, 64.
In allowing the pleadings in this case to be enlarged, the trial judge found the affirmative defenses had been addressed sufficiently in memoranda for the prescription issues heard prior to trial to give the Plaintiff notice. After our review of the record, we agree that the Plaintiffs had sufficient notice of the Act of God defense, particularly because it was raised in Essex’s answer to the consolidated suit filed by the trailer park tenants. Nevertheless, even without considering the Acts of God in 1985 and 1991, the Plaintiffs failed to prove more likely than not, [2?that the cause of the damage was the Defendant’s repair, raising and construction of the Federal Westbank Hurricane Protection Levee.
COSTS
The Plaintiffs assert that the trial judge abused her discretion in taxing costs that are not permitted under La.R.S. 13:3666 and 13:4533.[10]
The Plaintiffs first object to the $59,3597.96 awarded for Coastal Environments, Inc. and its principals, Dr. van Beek and Dr. Castille. Coastal submitted invoices for an amount of $65,809.52. Although the trial judge disallowed $10,000, the Plaintiffs argue that the award should be reduced further, because it includes fees for non-testifying “experts” and cannot be taxed. They contend that the Defendant produced bills from Coastal for work performed by approximately 16 Coastal employees, most of whom are not experts with special knowledge and many of whom performed secretarial type services. The Plaintiffs assert that costs attributable to Drs. Castille and van Beek’s assistants should not be included in their costs as they are not experts, did not testify, and mostly performed basic secretarial services. In addition, the Plaintiffs contend that some costs were duplicated, because they were incurred separately for the prescription issue hearings and the trial on the merits; that the amount of time spent preparing, developing and revising the reports was excessive; and that Costal’s costs included work that is not classified as either trial testimony or reasonable trial preparation, such as attending the trial, but not testifying, assisting defense counsel, and travel time. Although Dr. van Beek and Dr. Castille attended nine days of trial, they only testified a total of three days. The Plaintiffs assert that the costs for the other days should not be borne by the Plaintiffs.
133La.R.S. 13:4533 provides that “The costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.” La.R.S. 13:3666 A provides for costs of expert witnesses that testify in court to be taxed against the party cast in judgment based on the value of the time employed and the degree of learning or skill.
In Yuspeh v. Koch, 02-1179 (La.App. 5th Cir.5/28/03), 848 So.2d 96, 98-99, we stated:
Generally, expert witness fees attributable to trial testimony or depositions introduced as evidence at trial are reeov- *1105 erable as costs. Expert witness fees for time spent in preparation for that testimony are also recoverable. However, fees for time spent in consultation and other matters that simply benefit the attorney are not properly taxed as costs. Further, the amount of the expert witness fees must be reasonable. The amount actually charged by the expert does not determine the amount to be taxed as costs. The factors to be considered by the trial judge in setting expert witness fees to be taxed as costs include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of work performed, the knowledge, attainments and skill of the expert, the helpfulness of the expert’s report and testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert, and the awards in similar cases. The trial court is afforded great discretion in awarding costs, including expert witness fees, and the costs awarded will not be set aside absent a showing of abuse of that discretion. [Emphasis added.]
The invoices in this matter show that the Coastal experts spent a great deal of time investigating in order to prepare their reports and for trial testimony. They testified at trial. Most of the testimony in this matter consisted of expert testimony, and the issues involved in this matter were detailed and complex. In addition, this case had been ongoing for 16 years, with several hearings requiring preparation, as well as for the trial on the merits. The trial judge disallowed $10,000 of the amount submitted, taking into consideration those items that she found not taxable. | ¡.¿After our review of the record, we find no abuse of discretion in the amount of Coastal’s costs.
The Plaintiffs also argued that costs for the hearings on the prescription issues should be separated and considered waived since the Defendant did not file a Rule to tax those costs timely. The trial judge ruled there was only one trial, noting she altered the order of trial to allow the prescription issue to be tried first, and that she continued the rest of the case pending appellate review of that issue. The prescription issue was addressed in this Court twice, once on appeal, and the other in a writ application. Both times, the matter was remanded. Neither party won, because after the trial of the merits, it was found to be moot. We agree with the trial judge that the merits of the case was simply delayed pending the resolution of the prescription issue. Thus, any costs associated with the prior hearings were attributable to the trial costs.
Also disputed is the award of costs for the surveyor company, J. Dufrene Engineering, Inc. Dufrene testified at the first hearing on prescription issue, but not at trial. Since we agree that the costs associated with the first hearing in 2000 were part of the trial, we find no error in this regard.
Elmer was charged with, and disputes, the costs of the Defendant’s real estate appraiser Henry Tatje for the damages portion of the case. He contends the trial judge abused her discretion in this award, because Tatje failed to consider the most valuable piece of the property, the section with the businesses on it, although the property was expropriated in 1999. The Defendant argued that the appraisal correctly valued the land. The trial judge found the expert’s bill taxable as costs and awarded $8,400. We find no abuse of the trial judge’s discretion in this regard. However, we agree with Elmer that those costs should be reduced by $1,200.
*1106 ^Generally, only depositions used at trial and introduced and accepted into evidence, are taxable as costs. If a deposition is not used at trial, the cost of the deposition, including deponent’s fee for giving the deposition, may not be taxed as costs. La.R.S. 13:4533; Barrilleaux v. Franklin Foundation Hosp., 96-0343 (La.App. 1st Cir.11/8/96), 683 So.2d 348, 361, writ denied 96-2885 (La.1/24/97, 686 So.2d 864); Lacy v. ABC Ins. Co., 97-1182 (La.App. 4th Cir.4/1/98), 712 So.2d 189, 197.
Tatje’s invoice includes non-taxable items relating to his deposition preparation, his deposition which was not introduced at trial, and a charge related to a meeting with defense counsel. Consequently, we will reduce the amount of costs awarded for Henry Tatje, Inc. from $8,400 to $6,900.
Accordingly, the judgment of the trial court is hereby affirmed in regard to liability. Further, we amend the judgment to reduce the award of court costs from $85,362.54 to $83,862.54.

AFFIRMED AS AMENDED.

. After this suit was initially filed, the area was officially declared wetlands.

. This occurred before passage of the Federal Water Pollution Control Act of 1972 and the 1997 amendments, commonly referred to as the "The Clean Water Act.”

. See: Yates, et al. versus Charles Elmer, et al., No. 417-594 in the 24th Judicial District Court, and 06-CA-75 in this Court, consolidated with this suit.

. The petition was amended in 1997, and 1998.

. In 1999, the Defendant filed a petition to expropriate the Plaintiff's property in order to construct the permanent Northern levee now intruding on the property. In 2000, the permanent Northern levee construction commenced. The expropriation is not before the Court in this appeal.

.Reference is made to the exception of prescription as to the culvert only because it relates to whether the pleadings were enlarged. The exception again and granted in February of 2004. Supervisory writs were taken, and for the second time this Court found the issue premature. We note that the parties stipulated at trial that closing the culvert was not a cause of the Plaintiff’s damages, and we will not address that issue.

. For the law on taking of private property by a public entity and inverse condemnation, see: La. Const. Art. 6, § 42(A); La.R.S. 38:281(1), 301 through 308; State v. Chambers, 595 So.2d 598 (La.1992); Mitter v. St. John the Baptist Parish, 05-375 (La.App. 5th Cir. 12/27/05) 920 So.2d 263, 266; Lambert v. State Through Dept. of Transp. & Development, 96-160 (La.App. 5th Cir. 10/16/96), 683 So.2d 839, 843.

. In Elmer v. West Jefferson Levee Dist., 01-249 (La.App. 5th Cir. 111/27/01), 803 So.2d 229, 239, we determined that the Defendant’s actions in raising the Northern levee in 1985-1986 after Hurricane Juan was not a taking, thus was not an expropriation, as the taking of the properly for construction of the levee occurred in the early 1920's with the construction of the four foot "Westwego levee” on the north side of the Elmer property. We find no reason to revisit that decision in this appeal.
Under the defense of governmental immunity, the public entity is immune from liability for negligence when the acts are discretionary under La. R.S. 9:2798.1, or taken to prepare for an emergency under R.S. 29:735. See; Hontex Enterprises, Inc. v. City of Westwego, 02-506 (La.App. 5th Cir.12/11/02) 833 So.2d 1234, 1240; writ denied, 03-0505, (La.9/5/03), 852 So.2d 1041 and 03-0455 (La.9/5/03), 852 So.2d 1042.

. Nevertheless, we note that the reasons given by the Defendant for overlooking the Elmer property in the expropriations in 1987 were reasonable. The Northern levee had been raised and construction of the new interim levee there was not as critical to the safety of the public as the adjacent areas It was included in the plan to be addressed at a later date. Furthermore, the evidence shows that the Defendant’s decision in the levee alignment was a discretionary act. Thus, discretionary immunity would relieve it of liability in any event. See: La. R.S. 9:2798.1 and La. R.S. 29:735. For a discussion of governmental immunity, see Hontex Enterprises, Inc. v. City of Westwego, 02-506 (La.App. 5th Cir. 12/11/02) 833 So.2d 1234, 1240; writ denied, 03-0505, (La.9/5/03), 852 So.2d 1041 and 03-0455 (La.9/5/03), 852 So.2d 1042.

. The Rule to Fix Costs was Bled in April of 2005, heard on December of 2005 and January of 2006, and consolidated with the other two cases for appeal.